The **HERALD COMPANY** et al.,
Petitioners,

v.

**NATIONAL LABOR RELATIONS BOARD**, Respondent,

and

Building Service Employees International Union, Local 200, AFL–CIO, and Syracuse Mailers Union, No. 73, Intervenors.

**BUILDING SERVICE EMPLOYEES INTERNATIONAL UNION, LOCAL 200, AFL–CIO, and Syracuse Mailers Union, No. 73, Petitioners,**

v.

**NATIONAL LABOR RELATIONS BOARD**, Respondent,

and

The Herald Company et al., Intervenors.

Nos. 726, 727, 728, Docket 34620, 34791, 34935.

United States Court of Appeals, Second Circuit.

Argued March 2, 1971.

Decided June 11, 1971.

Tracy H. Ferguson, Syracuse, N. Y. (Bond, Schoeneck & King, Raymond W. Murray, Jr., Francis D. Price, Syracuse, N. Y., Sabin, Bermant & Blau, New York City, on the brief), for petitioner-intervenor, The Herald Co. et al.

Donald W. Savelson, Atty., N.L.R.B. (Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Leonard M. Wagman, Atty., Washington, D. C., on the brief), for respondent, N.L.R.B.

Bernard T. King, Syracuse, N. Y. (Blitman & King, Thomas J. Maroney, Syracuse, N. Y., on the brief), for petitioner-intervenor, Building Service Employees International Union, Local 200.

Arthur B. Hanson, Ralph N. Albright, Jr., Hanson, O'Brien, Birney & Stickle, Washington, D. C., on the brief, attorneys for amicus curiae The American Newspaper Publishers Ass'n.

Before LUMBARD, ANDERSON and FEINBERG, Circuit Judges.

LUMBARD, Circuit Judge:

The Herald Company, which publishes and distributes three newspapers in Syracuse, New York, petitions this court to review an order of the National Labor Relations Board, issued on March 3, 1970, pursuant to section 10(c) of the Act, and the Board cross applies for enforcement. Shortly after the Board filed its petition for enforcement, The Building Service Employees, International Union, Local 200, AFL–CIO and the Syracuse Mailers Union No. 73 intervened. These unions joined together in filing a petition to review the Board's order in a separate action on the theory that the Board failed to grant them certain relief, and the Company intervened in that case. These two cases have been consolidated and were heard together.

We deny the petition to review and grant enforcement of the Board's order.

Following a lengthy hearing the Board's Regional Director for its Third Region on July 19, 1967 issued a decision and directed an election for all of the distributors of the Herald Company's newspapers. He defined the appropriate bargaining unit in which to conduct the election as follows:

All city, motor route, street sales, country and suburban distributors employed by the Employer at Syracuse and the central New York area, but excluding all other employees, office clerical employes, guards, professional employees and supervisors as defined in the Act.

The Regional Director also found that the distributors were "employees" under section 2(3); 29 U.S.C. § 152(3) of the Act. Arguing that the distributors are independent contractors rather than employees, the Company moved to have the Board reopen the representation hearing. That motion was denied on November 15, 1967 and a subsequent motion for reconsideration was denied on December 4, 1967.

On January 4, 1968 the Regional Director conducted an election in the bargaining unit which he had found appropriate. The Union won that election by a vote of 63 to 31 and, on January 23, 1968, overruling the Company's objections to the election, the Director certified Local 200 as the distributors' collective bargaining representative.

An unfair labor practice proceeding ensued as a result of a complaint by the Union and on March 3, 1970 in a decision reported at 181 N.L.R.B. No. 62 the Board found that the Company violated sections 8(a) (1) and (5) of the Act by refusing to recognize and bargain with Local 200, which had been certified as the exclusive collective bargaining representative of the distributors, by refusing to bargain with the Mailers and by unilaterally changing conditions of employment after Local 200 had been certified. The Board also found that the Company violated sections 8(a) (1) and (3) of the Act by other discriminatory actions taken against the distributors with the intention of discouraging union membership and activities. The Board issued a bargaining order, as well as a traditional cease and desist order. It also ordered reinstatement of distributors discriminatorily terminated and that they be made whole for compensation which had been withheld from them by the Company.

■ The principal question at issue is whether the Board's finding that the distributors were employees, and not independent contractors, under section 2(3); 29 U.S.C. § 152(3), is supported by substantial evidence. Subsidiary to this are the claims of discriminatory discharge. We find substantial evidence in the record in support of the Board's findings that the distributors are employees and that twelve of them were discriminatorily discharged because of union activity. Accordingly we grant enforcement of the Board's orders.

Since N.L.R.B. v. United Insurance Co., 390 U.S. 254, 88 S.Ct. 988, 19 L.Ed.2d 1083 (1968) it has been settled that general agency principles are to be applied in distinguishing between "employees" under section 2(3) and "any individual having the status of an independent contractor." The Supreme Court held that the N.L.R.B.'s determination that debit agents of an insurance company were "employees" under the common law of agency should have been enforced by the Seventh Circuit. In News Syndicate Company, Inc., 164 N.L.R.B. 422, 423 (1967) the Board articulated the agency test as follows:

"In determining the status of persons alleged to be independent contractors, the Board has consistently held that the Act required application of the 'right to control' test. Where the one for whom the services are performed retains the right to control the manner and means by which the result is to be accomplished the relationship is one of employment, while, on the other

hand, where control is reserved only as to the result sought, the result is that of an independent contractor. The resolution of this question depends on the facts of each case, and no one factor is determinative."

Thus we turn to the factual background of the relationship between the "distributors" and the Herald Company in order to assess "the total factual context * * * in light of the pertinent common-law agency principles." N. L. R. B. v. United Insurance Co., *supra*, 390 U.S. at 258, 88 S.Ct. at 991.

The Herald Company prints, sells and distributes The Herald Journal, a daily evening newspaper and The Herald American, a Sunday paper. Through an operating division, it also publishes a daily morning paper, The Post Standard. To distribute these papers in Syracuse and the surrounding area, the Company engages over 100 distributors. Since 1947 each distributor has received a franchise contract from the Company, and in arguing that the distributors are no longer employees, the Company places great emphasis on the terms of these contracts which explicitly state that the distributor occupies at all times the position of an independent contractor and controls "all ways and means relating to the proper performance and completion of the contract."

Both the Company and the Board point to a myriad of facts to support their opposing positions regarding the status of the distributors. The Company relies principally on the following facts: The franchise contracts, as redrafted in 1965, give the distributors the right to distribute the newspapers within an exclusive territory. They state that personal performance of the distributors' contractual obligation is not required; as a result, they are free to hire substitutes and to select delivery boys to work on routes which they establish. Distributors have considerable latitude in planning their own work schedules. They decide whether or not to extend credit to their customers and bear the risk of non-payment. They

provide motor vehicles and other equipment at their own expense and receive no vacation, holiday, or fringe benefits from The Herald. They purchase their own accident insurance and are responsible for their own bookkeeping.

A distributor's income consists primarily of the difference between the wholesale rate at which he purchases the papers and the resale rate at which he sells the papers to his carriers. The wholesale rate is prescribed by the terms of the individual contracts; there is no uniform wholesale rate. Since 1965 the form contracts have set forth the retail rates as well as the wholesale rates and before that time the Company reserved the right to set resale rates.

Some of the distributors have been permitted to hold other jobs in addition to their distributorships and to distribute other newspapers along with The Herald's papers. On occasion, the distributors have acted in competition with the Company. It has been customary for distributors to purchase calendars from the Company each year at Christmas time for distribution by their carrier boys. In 1965 and 1966 the distributors had their own calendar published and distributed it in competition with the Company's own calendar.

The Company gives much emphasis to the fact that the distributors are free to sell or transfer their franchises and have done so in many instances without any Company intervention. The contracts give them the right to sell their franchises subject to The Herald's right to purchase within 30 days at the same price; but the Company has seldom exercised its right of first purchase. The record shows that since 1947 more than 165 transfers have occurred. Many distributors have received in the neighborhood of $10,000 for their franchises, and a few have received as much as $17,000. Furthermore, a few distributors have been able to devise their franchises to their widows, and in one or two instances the widows have continued to run them. The Company takes the position that it has little control over the sale or

transfer of the franchises and no control over their value.

On the other hand, in making its argument that the distributors are "employees," the Board focuses principally on the following facts: The Company determines the geographical boundaries of the territory to be serviced and draws up a schedule for the pickup and delivery of the newspapers. It requires distributors to submit to it lists containing the names and addresses of all of their customers and carrier boys. The Company often gives instructions directly to carrier boys and in a few instances has instructed distributors to change or discharge them. Distributors work under the jurisdiction of The Herald's circulation department and four district supervisors who work directly in the field where they investigate delivery problems and participate in their resolution. The district supervisors sometimes contact subscribers to determine whether or not distributors have been following Company instructions.

Customer complaints are often directed to the circulation department rather than to the distributors. When the department receives a complaint, it notifies the distributor and requires that he investigate it. If the complaint concerns the non-delivery of a paper within the city limits, the Company may service the customer by delivering the paper itself. It then levies a 25¢ charge on the distributor unless he can convince the Company that he should not be charged. The Herald regularly communicates with the distributors concerning complaint handling as well as other matters such as stop and start orders, inserts, and supplements to the newspapers. To deal with these matters, it inundates the distributors with instruction letters, memoranda, telephone calls, and requests for office meetings.

The Herald runs numerous promotional contests in which the distributors' participation is encouraged to the point where it is compelled. As a part of its promotional program, it sends canvassers into the distributors' territories to secure new subscription orders, and the distributors are expected to provide carrier boys to assist the Company's canvassers. The Company pays the canvassers, carrier boys, and distributors for their participation in the canvass and the amount paid depends upon the success of the canvass and the increase in circulation.

Moreover, the evidence indicates that the Company has substantial control over the distributor's immediate income as well as some control over the value of the distributorships. The Company sets limits on their compensation by establishing "wholesale price ceilings" in the franchise contracts. The ceilings have the effect of increasing the wholesale price of the papers to the distributors when their purchases rise above their normal draw. Even more significant, the Company frequently awards bonuses and subsidies as well as promotional monies, and these extracontractual payments are an important part of the distributors' income. By manipulating the extracontractual payments and fluctuating its wholesale price ceilings, the Company is able to control the immediate earning power of the distributors and regularly exercises this control. The record shows that The Herald also has some control over the value of the franchises. It can refuse to renew the franchise contracts—many of which are for short terms—and by threatening refusal to renew, can decrease the value of the franchises. However, at least in the past, even those distributors who have received non-renewal notices have been able to obtain substantial proceeds as a result of the sale of their franchises.

After examining the record of the twenty-eight day representation proceeding, the Regional Director concluded that although the distributors do have "a proprietary interest" in their franchise, they are employees under section 2(3) of the Act rather than independent contractors. Concerning the relationship between The Herald and its distributors, he wrote:

&ast; &ast; &ast; the record clearly shows that in accomplishing the distribution of its newspaper, an integral part of its

operation, the Employer has maintained control over the distributors' earnings and the manner and means of accomplishing the results. * * * The record shows that the distributors are not controlled by self-determined personal investment expenditures and market conditions, but are controlled by the Employer.

The Board accepted the Regional Director's finding that the distributors are employees under the Act and denied the Company's motion to reopen the representation hearing.

We find substantial evidence to support the Board's conclusion that the Company has the authority to, and does, exercise supervision over the distributors' performance of their duties and that the Company can control the value of the distributorships as well as the immediate incomes of distributors. This alone appears to be a sufficient basis to support the Board's finding that the distributors are employees rather than independent contractors and are entitled to the protection of the National Labor Relations Act.

Moreover as in N.L.R.B. v. United Insurance, the very least that can be said for the Board's decision is that it was "a choice between two fairly conflicting views," and, as Mr. Justice Black stated in that case, "Such a determination should not be set aside just because a court would, as an original matter, decide the case the other way." 390 U.S. at 260, 88 S.Ct. at 991 (1967); see also Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951). We hold therefore that the Board did not err in finding that despite a proprietary interest in their franchise contracts, The Herald's distributors are employees under section 2(3); 29 U.S.C. § 152(3) rather than independent contractors.[1]

The Company further argues that the Board's Findings that it violated sections 8(a) (1), 8(a) (3) and 8(a) (5) of the Act are not supported by substantial evidence and it seeks to set aside the Board's order that it reinstate twelve distributors who were discriminatorily terminated and that it make them whole for the losses which they suffered as well as the Board's order that it must bargain with the Syracuse Mailers Union No. 73. We find in the record substantial evidence to support the Board's finding of discriminatory terminations and other unfair practices. The affirmative remedies which the Board ordered here pursuant to its authority under section 10(c) of the Act—its reinstatement order, its compensatory order, and its bargaining order—were all well within the remedial authority which has been

---

1. The Company cites the recent decision of the Board's Regional Director for the 9th Region in *Scripps Company as Publisher of the Cincinnati Post & Times Star* and the *Cincinnati Newspaper Guild Local 9 of the American Newspaper Guild*, 9-RC-8798 (1971), where the Director found that the thirteen country route drivers for the Cincinnati Post are independent contractors rather than employees under the N.L.R.A. The *Scripps* case is factually distinguishable from the instant case since the Cincinnati Post's country route drivers have exclusive control over the conduct of their business in addition to a proprietary interest in their franchises. Their franchise contracts have never been terminated at their employer's initiative, and their employer has never precluded them from assigning their rights under the contracts to persons of their own choosing. They are compensated on the basis of negotiated rates, and receive no large extracontractual payments which are within the discretion of their employer such as bonuses, promotional benefits, or subsidies. They are not required to attend any company meetings; nor are they required to attend meetings with employer representatives to discuss distribution problems. In contrast, The Herald Company has frequently terminated distributorships at its own initiative (in some instances by refusing to renew contracts for a limited term), has regularly given large amounts of extra-contractual compensation which are entirely within its discretion, has compelled its distributors to participate in a myriad of "company" activities including extensive promotional campaigns, and has supervised the resolution of many of its distributors' delivery problems.

vested in the Board by Congress. N.L.R.B. v. J. H. Rutter-Rex Mfg. Co., Inc., 396 U.S. 258, 90 S.Ct. 417, 24 L.Ed.2d 405 (1969); F. W. Woolworth Co. v. N.L.R.B., 121 F.2d 658, 662 (2d Cir. 1941); N.L.R.B. v. Gissel Packing Co., Inc., 395 U.S. 575, at 612, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969).

 The Union takes the position that the Board did not go far enough in shaping relief through which the Company would make amends for its unfair labor practices. The first addition which Local 200 seeks to the affirmative relief which has been ordered by the Board is compensatory damages both for itself and the distributors for the Company's failure to bargain with the Union, and it contends that the failure to bargain should relate back to the Union's first claim of representation on June 24, 1966. The Union seeks reimbursement to the distributors for "the monies and other contractual benefits they would have received had The Herald Company bargained with Local 200 upon its valid claim of representation dating back as far as at least June 24, 1966." The Board found that the failure to bargain took place only after the Union had been certified in January of 1968, rather than at the time of its first claim of representation in 1966. Since it thought that a bargaining order would be a sufficient remedy for petitioner's failure to bargain in 1968, it refused to award compensatory damages.

The award of monetary relief for an employer's failure to bargain is an unusual remedy which has been used very sparingly by the Board, and Local 200 is unable to show a similar factual situation where the Board has ordered such relief.[2] The Union cites the trial examiners' recommendations in Ex-Cell-O Corporation and Zinke Foods where they suggested monetary relief to compensate for the employers' failures to bargain earlier, but these cases do not support the Union's position because in each instance the Board rejected the trial examiners' recommendations of compensatory orders. Ex-Cell-O Corp., No. 25–CA–2377 (N.L.R.B. Trial Examiner's Decision, March 2, 1967); Ex-Cell-O Corporation, 185 N.L.R.B. No. 20 (1970); Zinke Foods, Inc., No. 30–CA–372 (N.L.R.B. Trial Examiner's Decision, December 18, 1966). Zinke Foods, Inc., 185 N.L.R.B. No. 109 (1970). We agree with the Board that The Herald's failure to bargain occurred after it was certified in January of 1968 rather than in 1966 when Local 200 made its first claim of representation and we find that the Board did not err in failing to order the Company to pay monetary damages for its failure to bargain in 1968.[3]

2. In N. L. R. B. v. Tiidee Products, Inc., 138 U.S.App.D.C. 249, 426 F.2d 1243 (1970), the Court of Appeals for the District of Columbia remanded the case to the Board to ascertain whether the bargaining order which the Board had ordered was sufficient to make amends for the Company's failure to bargain earlier, and the Court directed the Board to order monetary relief if on remand it concluded that the bargaining order was not, by itself, a sufficient remedy. However, even *Tiidee Products* offers little support for Local 200's position in the instant case because there the employer, as a delaying tactic, refused to bargain with an already certified Union on grounds which the District of Columbia Circuit found to be "manifestly unjustifiable" whereas, in contrast, The Herald Company may have had some doubt regarding its responsibility to bargain with Local 200 in 1966, two years before the Union was certified.

3. The Union's argument that the failure to bargain should relate back to its first claim of representation on June 24, 1966 rather than the date of election certification in January of 1968 is unpersuasive. The Union's first claim of representation was based on authorization cards, and a certification election is generally thought to be a "preferred" method of ascertaining whether a Union has majority support. N. L. R. B. v. Gissell Packing Co., *supra,* 395 U.S. at 602, 89 S.Ct 1918 (1969). Due to the fact that The Herald may have had doubts concerning its duty to negotiate when it was first presented with the authorization cards in 1966, we agree with the Board that the failure to bargain occurred only after Local 200 had been officially certified in 1968.

Local 200 presses two additional claims for monetary damages. First, it claims that the Board erred in failing to order The Herald to reimburse those employees who were forced to pay for Thanksgiving newspapers in 1965. The Thanksgiving edition of the Company's evening newspapers was delayed as a result of a mechanical failure of the presses, and many copies were received by distributors two or three hours late. Due to the distributors' late receipt of the newspapers, some of the carrier boys did not get them until after 7:00 P.M. and refused to deliver them. Distributors who were members of Local 200 refused to pay the Company for these newspapers because of their inability to convey them to the customers.

The Herald took no immediate action against these distributors, but the Union contends that in a few instances, their refusal to pay the Company for the papers in addition to their other Union activities led to their discharge a year or two later. The trial examiner made no specific recommendation concerning The Herald's obligation to reimburse employees who paid for the Thanksgiving newspapers. He merely asserted that the Company should "make whole any and all employees who have suffered loss of subsidies, bonuses, promotion moneys or other emoluments of value as a result of what has been found to be respondent's discrimination against them."

The Union's final claim is that the Board erred in its failure to require the Company to grant an increase to those employees who were not given a two cent increase in 1967. On October 27, 1967 the Company sent a form letter to the distributors which indicated that the price of the paper would be raised to 10¢ per copy, but that letter also gave them a new option: each distributor was offered an additional 2¢ per paper for one day per week if he would deliver the complete Sunday paper with all its supplements on the day of publication and would perform a minimum of 52 inserts per year. Every distributor was given the option of signing this agreement and seventy of them did so. Those who did not sign received no extra compensation; and those who did realized approximately $50 additional income per week. As with the Thanksgiving day newspapers, the trial examiner made no specific recommendation concerning The Herald's liability to those distributors who had refused to sign the two cent agreements.

Although the Board adopted the trial examiner's compensatory requirement for the benefit of all employees who had been the object of discrimination because of their union activities, it found that "the make-whole requirement is not intended to include either the 2-cent increase which was given to some distributors and not other distributors when the Respondent raised its newspaper price, or for failure to deliver newspapers on Thanksgiving Day 1965, since there is no showing that the Respondent's treatment of distributors in these matters was discriminatorily motivated." In each episode The Herald's conduct appears to have been motivated by business considerations rather than any anti-union animus. No immediate action was taken against distributors who refused to pay for the Thanksgiving newspapers and the Union's allegation that the refusal to pay was connected with later discharges appears to have no factual basis. Moreover, the 2-cent increase was an option which was made available to all employees and those who did not choose to take advantage of it have no cause for complaint now. We find no merit to the Union's contention that the Board erred in failing to compensate the employees in connection with these matters.

We find that the parties' other contentions are without merit. Enforcement is granted.