**Fuad A. MUKHTAR, Plaintiff,**

v.

**CASTLETON SERVICE CORPORATION d/b/a Doctors Immediate Medcenter, Defendant.**

No. IP 95–576–C.

United States District Court, S.D. Indiana, Indianapolis Division.

Feb. 26, 1996.

Steven V. Shoup, Owen Shoup & Kinzie, Indianapolis, Indiana, for plaintiff.

P. Gregory Cross, Cross Marshall Shuck Deweese Cross & Feick, Muncie, Indiana, for defendant.

## ENTRY ON DEFENDANT'S MOTION TO DISMISS

HAMILTON, District Judge.

Plaintiff Dr. Fuad A. Mukhtar worked as a physician for several years at a clinic owned by defendant Castleton Service Corporation ("CSC"). The clinic operated under the name "Doctors Immediate Medcenter." The parties' contractual relationship ended when CSC terminated it effective October 1, 1994. Dr. Mukhtar has sued CSC for violation of the Age Discrimination in Employment Act, 29 U.S.C. §§ 621, et seq. ("ADEA"). Defendant CSC contends that it is not an "employer" under the ADEA and that plaintiff was not an "employee" under the ADEA. CSC has therefore moved to dismiss this action for lack of subject matter jurisdiction. The Seventh Circuit treats the "employer" issue as an element of the court's subject matter jurisdiction under the ADEA, e.g., Rogers v. Sugar Tree Products, Inc., 7 F.3d 577, 579 (7th Cir.1993), and the logic of that holding extends to the question whether the plaintiff was an "employee" for purposes of the ADEA. Accordingly, the court is the finder of fact on these jurisdictional issues. E.g., LaSalle Nat'l Trust, N.A. v. ECM Motor Co., 76 F.3d 140, 143–44, (7th Cir.1996) (under Rule 12(b)(1), district court may find jurisdictional facts itself); Grafon Corp. v. Hausermann, 602 F.2d 781, 783 (7th Cir. 1979); Radulescu v. Moldowan, 845 F.Supp. 1260, 1262 (N.D.Ill.1994). Because the jurisdictional issues presented by defendant's motion to dismiss are completely distinct from the merits, there is no risk here that the jurisdictional inquiry will become a "doppelgänger of the inquiry on the merits." Pratt Central Park Ltd. Partnership v. Dames & Moore, Inc., 60 F.3d 350, 351 (7th Cir.1995).

The defendant's motion to dismiss raises two independent grounds for finding a lack of subject matter jurisdiction. First, the ADEA applies only to discrimination in employment. Defendant claims that it had a landlord-tenant relationship with Dr. Mukhtar rather than an employment relationship. Dr. Mukhtar asserts that the economic realities of the relationship amount to employment. Second, defendant argues that even if Dr. Mukhtar was its employee, the ADEA defines "employer" as "a person engaged in an industry affecting commerce who has twenty or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year." 29 U.S.C. § 630(b). Defendant CSC did not itself have twenty or more employees during the relevant time period. Plaintiff asserts that CSC and two other clinics under common ownership amount to a single integrated enterprise all of whose employees

may be counted to satisfy the twenty employee jurisdictional threshold. See *Rogers v. Sugar Tree Products*, 7 F.3d at 582. The court held a hearing on the defendant's motion on February 16, 1996. The evidentiary record consists of the amended affidavit of Fuad A. Mukhtar; the affidavits of R. Michael Beckwith, Eric M. Beckwith, Mario Perrino, and Joseph Gormley; all exhibits submitted by the parties with their briefs and the affidavits; and Defendant's Exhibit 20, admitted at the hearing. The court also heard brief testimony from Eric M. Beckwith and Dr. Mukhtar. In this entry, the court makes its findings of fact and conclusions of law, and denies defendant's motion to dismiss.

## I. The Parties' Relationship

**A. Facts:** The contractual relationship between Dr. Mukhtar and CSC lasted from January 1, 1990, until October 1, 1994. The written contract was called a "Lease." It referred to CSC as "Landlord" and to Dr. Mukhtar as "Tenant." The contract recited that CSC owned certain premises that it had constructed and equipped for use as an "immediate care facility," that Dr. Mukhtar was a licensed physician, and that other physicians would also be practicing at the facility. The contract leased the premises to Dr. Mukhtar for his "nonexclusive use." Dr. Mukhtar agreed not to alter the facility and to use it only as an immediate care facility. The contract required CSC to provide and maintain the medical equipment and supplies at the premises and to provide and pay for all utilities. The contract also required CSC to staff the facility with nurses and other technical and clerical staff. The staff were employees of CSC, and CSC was responsible for hiring, paying, and terminating the clinic staff. However, the clinic staff members were "under the supervision of Tenant and other practicing physicians in regards all of their professional duties." CSC also indemnified Dr. Mukhtar for any payroll tax obligations for such employees.

The contract provisions concerning payment are especially important here. CSC was responsible for providing "all business management services," which included setting and collecting fees for Dr. Mukhtar's services. The "rent" that Dr. Mukhtar paid under this lease was calculated as follows:

> Landlord shall receive as rent an amount equal to the gross annual charges to patients of the facility minus $87,500.00, prorated based on actual time Tenant leases facility, and minus 7 percent of the gross patient charges of the facility in excess of $60,000.00 per month based on actual days tenant leases facility. For convenience of the parties and as part of the services provided by Landlord to Tenant, Landlord shall collect all of Tenant's gross receipts from the facility and shall pay monthly to Tenant 1/12th of the $87,500.00 deduction. . . .

CSC and Dr. Mukhtar treated the "rent" payments as "nonemployee compensation" for tax purposes, reported to the IRS on Form 1099 rather than W–2 forms. Mr. Perrino, the accountant for CSC, recounted that the IRS audited CSC's tax returns, specifically examined the "leasing" arrangement, and did not object to CSC's failure to withhold employee taxes from the payments.

The contract provided that Dr. Mukhtar would purchase professional liability insurance, but that CSC would pay up to $5,000 per year for that insurance. CSC granted to Dr. Mukhtar a license to use CSC's service mark for "Doctors Immediate Medcenter" for the duration of the relationship. The contract also required Dr. Mukhtar to execute a "noncompetition agreement" to the effect that, upon termination of the relationship for essentially any reason, Dr. Mukhtar could not practice medicine within ten miles of the CSC facility for a period of 12 months, with an exception for certain emergency services. Under the contract, Dr. Mukhtar also agreed that all medical records would be held at the facility in CSC's custody after termination of the relationship, but that CSC would provide records or copies upon request when authorized by the patient.

With respect to scheduling and services, the contract required Dr. Mukhtar to cooperate with other physicians practicing at the facility so as to keep the facility open and staffed by a physician at least 12 hours per day Monday through Saturday, and 7 hours

on Sunday. The document further provided: "Except during unusual circumstances or with the permission of Landlord, Tenant shall be available an average of thirty nine (39) hours each week. Said daily hours shall be continuous and shall include the hours between 9:00 a.m. and 9:00 p.m. Monday through Saturday and 11 a.m. to 6 p.m. Sunday." The contract also required Dr. Mukhtar to "follow up by telephone with each patient, where appropriate, within forty eight (48) hours after the patient's visit." The contract implicitly acknowledged that Dr. Mukhtar could employ another physician to assist him, but required that such a person also be "mutually acceptable" to other physicians at the facility and to CSC.

Dr. Joseph Gormley provided additional information about scheduling and services. He testified in his affidavit that he also has practiced medicine at the same facility under a similar arrangement with CSC. Dr. Gormley stated that he and Dr. Mukhtar had difficulty working out a schedule of hours that would allow both to meet their obligations under their respective "lease" agreements. Dr. Gormley requested CSC to provide a suggested schedule allocating time between the two doctors, and CSC did so. He testified: "At no time was I ever directed by [CSC] to work certain hours. It was always my understanding that all scheduling of hours was left to the discretion of the physicians unless they chose otherwise." Dr. Mukhtar's affidavit states that his "work schedule was dictated" by CSC.

The original term of Dr. Mukhtar's contract was one year, ending December 31, 1990. The contract provided for "automatic" renewal for two one-year periods and gave each party the right to terminate on thirty days notice. The parties apparently took no action to renegotiate or modify their agreement after it expired by its terms on December 31, 1992. The parties continued their relationship until CSC gave Dr. Mukhtar written notice of cancellation on September 1, 1994, effective October 1, 1994.

Based on Dr. Mukhtar's testimony at the hearing, the court finds that CSC did not control or seek to control his professional judgment in the treatment of patients.

**B. Conclusions of Law:** Courts considering federal employment discrimination cases have often decided whether a particular relationship was employment or an independent contractor relationship. See, *e.g., Knight v. United Farm Bureau Mut. Ins. Co.,* 950 F.2d 377, 380 (7th Cir.1991); *Wilson v. United Farm Bureau Mut. Ins. Co.,* No. IP 93–1460–C H/G, 1995 WL 378521 (S.D.Ind. June 15, 1995). The parties have not cited, nor has the court found, any cases presenting a choice between employment and landlord-tenant relationships. The standards developed in cases dealing with the employee-independent contractor problem provide guidance for this situation also, although there is not a perfect fit in the factors considered.

▮ The labels of lease, landlord and tenant in the contract between CSC and Dr. Mukhtar are not binding for the purposes of the ADEA. See *Dixon v. Burman,* 593 F.Supp. 6, 9 (N.D.Ind.1983), *aff'd mem.,* 742 F.2d 1459 (7th Cir.1984). "[T]he decisive issue to be determined is not whether the parties intended plaintiff to be an 'independent contractor,' but whether she may in any respect be deemed to have been an 'employee' within the scope of Title VII's [and the ADEA's] protection." *Id.* The parties cannot agree to waive otherwise applicable protection provided by acts of Congress. *Id.* Thus, even though the parties may have labelled their relationship in one way, their labels do not control if enough of the indicia of an employment relationship are present. *E.E.O.C. v. First Catholic Slovak Ladies Ass'n,* 694 F.2d 1068, 1070 (6th Cir.1982) (whether person is protected by ADEA "should not center on the label which the organization has chosen to give to the position"); see also *Stone v. Pinkerton Farms, Inc.,* 741 F.2d 941, 945 (7th Cir.1984) (regarding agency issue in negligence suit).

▮ In looking past labels, courts have used various names for tests involving whether a hired party was an employee or independent contractor under the ADEA. But whether the test is called either a pure "economic realities test" or a "hybrid" test between the economic realities test and a "right

to control" test, the factors the courts consider have been substantially similar. Under the ADEA, the Seventh Circuit has applied the "economic realities" test made up of five factors:

> (1) the extent of the employer's control and supervision over the worker, including directions on scheduling and performance of work; (2) the kind of occupation and nature of skill required, including whether skills are obtained in the workplace; (3) responsibility for the costs of operation, such as equipment, supplies, fees, licenses, workplace, and maintenance of operations; (4) method and form of payment and benefits; and (5) length of job commitment and/or expectations.

*Hayden v. La–Z–Boy Chair Co.,* 9 F.3d 617, 622 (7th Cir.1993); *Rogers v. Sugar Tree Products,* 7 F.3d 577, 581 (7th Cir.1993). See also *Knight v. United Farm Bureau Mut. Ins. Co.,* 742 F.Supp. 518, 521 (N.D.Ind.1990), *aff'd,* 950 F.2d 377, 378–79 & n. 2 (7th Cir. 1991). In addition to the employer's right to control the means and manner of the worker's performance, the "hybrid" test identifies eleven factors:

> (1) the kind of occupation, with reference to whether the work usually is done under the direction of a supervisor or is done by a specialist without supervision; (2) the skill required in the particular occupation; (3) whether the "employer" or the individual in question furnishes the equipment used and the place of work; (4) the length of time during which the individual has worked; (5) the method of payment, whether by time or by the job; (6) the manner in which the work relationship is terminated, e.g., by one or both parties, with or without notice and explanation; (7) whether annual leave is afforded; (8) whether the work is an integral part of the business of the "employer"; (9) whether the worker accumulates retirement benefits; (10) whether the "employer" pays social security taxes; and (11) the intention of the parties.

*E.g., Oestman v. National Farmers Union Ins. Co.,* 958 F.2d 303, 305 (10th Cir.1992). Cf. *Knight,* 950 F.2d at 379 n. 2 (characterizing these eleven factors as additional ones for the economic realities test).

■ The most authoritative statement of the applicable legal standard was announced by the Supreme Court in *Nationwide Mut. Ins. Co. v. Darden,* 503 U.S. 318, 112 S.Ct. 1344, 117 L.Ed.2d 581 (1992). That decision interpreted the term "employee" under the Employee Retirement Income Security Act of 1974 ("ERISA"). ERISA defines an "employee" the same way the ADEA does—*i.e.,* as a person "employed" by an employer. See 29 U.S.C. § 1002(6). Finding no further statutory explanation of the term nor any expression of intention to the contrary, the Court adopted what it called a common law agency test:

> In determining whether a hired party is an employee under the general common law of agency, we consider the hiring party's right to control the manner and means by which the product is accomplished. Among the other factors relevant to this inquiry are the skill required; the source of the instrumentalities and tools; the location of the work; the duration of the relationship between the parties; whether the hiring party has the right to assign additional projects to the hired party; the extent of the hired party's discretion over when and how long to work; the method of payment; the hired party's role in hiring and paying assistants; whether the work is part of the regular business of the hiring party; whether the hiring party is in business; the provision of employee benefits; and the tax treatment of the hired party.

503 U.S. at 323–24, 112 S.Ct. at 1348 (quoting *Community for Creative Non–Violence v. Reid,* 490 U.S. 730, 751–52, 109 S.Ct. 2166, 2178–79, 104 L.Ed.2d 811 (1989)). Given the large number of factors, "the common-law test contains 'no shorthand formula or magic phrase that can be applied to find the answer.... [A]ll of the incidents of the relationship must be assessed and weighed with no one factor being decisive.'" 503 U.S. at 324, 112 S.Ct. at 1349 (quoting *NLRB v. United Ins. Co. of America,* 390 U.S. 254, 258, 88 S.Ct. 988, 991, 19 L.Ed.2d 1083 (1968)).

The common law agency test might be considered narrower than the economic realities test or the hybrid test on the theory that ERISA does not share the same remedial purposes of the ADEA or Title VII. See *Thomason v. Prudential Ins. Co. of America*, 866 F.Supp. 1329, 1335 (D.Kan.1994). However, in *Darden* the Supreme Court explained that it had already abandoned the practice of construing the term "employee" "in the light of the mischief to be corrected and the end to be attained." 503 U.S. at 325, 112 S.Ct. at 1349 (referring to *Reid*, 490 U.S. 730, 109 S.Ct. 2166, and quoting *United States v. Silk*, 331 U.S. 704, 713, 67 S.Ct. 1463, 1468, 91 L.Ed. 1757 (1947)). Therefore, the Court instructed, where a statute's definition of "employee" is not helpful, the common law agency test should be applied. 503 U.S. at 325, 112 S.Ct. at 1349.

Like ERISA, the statutory language of the ADEA does not provide helpful guidance as to who is an employee, so the *Darden* standard should apply here. See *Frankel v. Bally, Inc.*, 987 F.2d 86, 90 (2d Cir.1993) (applying common law test under ADEA); *Cox v. Master Lock Co.*, 815 F.Supp. 844, 846 (E.D.Pa.) (same), *aff'd mem.*, 14 F.3d 46 (3d Cir.1993). However, other courts have observed that, for practical purposes, no difference exists between the various tests. See *Wilde v. County of Kandiyohi*, 15 F.3d 103, 106 (8th Cir.1994); *Frankel*, 987 F.2d at 90; *Thomason*, 866 F.Supp. at 1336. This court accordingly follows the articulation of factors in *Darden* for the common law agency test to decide whether Dr. Mukhtar was an employee under the ADEA. Because the Supreme Court did not limit the test to these factors, the court also implicitly considers the related factors from the other tests.

■ On balance in this case, the factors identified in *Darden* weigh substantially in favor of finding that Dr. Mukhtar was an employee of CSC. However, several factors weigh against that finding. First, the skill required for Dr. Mukhtar's services to patients tends to weigh against treating him as an employee. Dr. Mukhtar is, after all, a professional, a physician. As he testified, CSC did not try to control his exercise of his professional medical judgment in the treatment of his patients. The other factors that weigh against treating Dr. Mukhtar as an employee are the absence of most conventional employee benefits and the parties' tax treatment of the relationship. CSC did not provide Dr. Mukhtar with conventional employee benefits such as health or life insurance, vacation or sick pay, or retirement benefits. (As noted, however, CSC did agree to pay $5,000 toward Dr. Mukhtar's own purchase of professional liability insurance.) The evidence shows that both parties handled CSC's payments to Dr. Mukhtar as something other than wages for tax purposes. CSC points out that the IRS audited its returns, specifically examined the "lease" relationships, and did not object to the treatment of those "rent" payments as other than wages. However, the court has no information concerning the scope of the IRS audit or the reasons for its conclusions. Those conclusions add little if any weight to the fact that the parties did not treat the payments as wages for tax purposes.

Most of the other factors identified in *Darden* weigh substantially in favor of an employment relationship. Under the "lease," CSC was the source of virtually all "instrumentalities and tools." CSC provided to Dr. Mukhtar a fully equipped medical clinic. The location of the work was a facility owned by CSC. Under the "lease," CSC hired, paid, and fired the clinic staff of nurses, technicians, and secretaries. Dr. Mukhtar had very little discretion over when and how long to work. The lease required him to be present at the clinic an average of at least 39 hours per week, unless he got CSC's permission to work less. The lease gave Dr. Mukhtar some flexibility in arranging specific hours with the other physician working at the clinic, but that flexibility should not be exaggerated. The arrangement was similar to a "flex-time" arrangement in which several employees are given flexibility in scheduling their hours so long as the employer can count on certain minimum staffing levels at specified times. The leases told the two "tenants" exactly which hours they were required to keep the clinic open.

The method of payment here weighs heavily in favor of an employment relationship.

Under the lease, CSC was responsible for collecting fees from patients, and then kept as "rent" "an amount equal to the gross annual charges to patients of the facility minus $87,500.00, prorated based on actual time Tenant leases facility, and minus 7 percent of the gross patient charges of the facility in excess of $60,000.00 per month based on actual days tenant leases facility." The lease then provided for monthly payments to Dr. Mukhtar of the $87,500.00 "deduction." This "rent" obviously looks very much like a base salary of $87,500, paid monthly, with a bonus of 7 percent of sales above a specified monthly threshold.

CSC points out that it is not unusual for commercial leases to calculate rent based on the tenant's sales. While that is true, such situations are not comparable to this "lease." Unlike most commercial operations, the only cash this "tenant" would even see under the "lease" would be the monthly payment of his "deduction" from "rent." The "landlord" collected all cash from customers (patients). If courts are to look at "economic realities," this court must recognize that CSC was taking virtually all of the economic risk in this relationship and stood to receive nearly all the entrepreneurial gain if the venture was successful.

*Darden* also lists as factors "whether the work is part of the regular business of the hiring party; whether the hiring party is in business." 503 U.S. at 324, 112 S.Ct. at 1348. CSC itself is clearly in some business, but it tries to draw a distinction between its business and Dr. Mukhtar's. CSC says that Dr. Mukhtar practices medicine and that CSC is in the business of providing clinic facilities to physicians. The "lease" required CSC not only to provide the physical office facility but also to supply the "tenant" with a full set of clinic equipment, a professional support staff for the clinic, and the business management of the clinic. All the doctor did was practice medicine, with essentially no economic risk. While surely not all suppliers of "turnkey" operations become the "employers" of their customers or tenants, under this "lease" CSC was in the business of running medical clinics, and the physicians' services were merely one essential component of that business.

The fact that the "landlord" bears essentially all the economic risk from providing those services (and reaps essentially all profit from success) shows what business CSC is actually in, at least for purposes of the ADEA analysis.

The duration of the relationship is also a factor under *Darden*. CSC argues that the one year term with automatic renewals and a thirty day notice requirement for termination is more typical of commercial leases than of employment contracts. However, employment contracts for specific terms are not that unusual, especially where each party may terminate at any time for any reason on thirty days notice. This factor is at most neutral in this analysis.

Overall, the relevant factors weigh substantially in favor of finding an employment relationship between CSC and Dr. Mukhtar for purposes of the ADEA. Looking past the labels and focusing on the "economic reality" of the relationship, it is difficult to find a difference between this relationship and one in which a firm that owns, operates, and staffs a clinic employs a physician for 39 hours of service for week in return for an annual salary of $87,500, paid monthly, with a bonus of 7 percent of fees above a substantial threshold.

CSC points out that state medical licensing law influenced the parties to try to structure their relationship so as to avoid committing the felony of unauthorized practice of medicine. See Ind.Code § 25–22.5–8–1. Under Indiana law, only an individual person may receive an unlimited license to practice medicine. Ind.Code § 25–22.5–3–1. By law, only hospitals and certain kinds of "health care organizations" may "employ" physicians without violating the law; however, such employers may not "direct or control independent medical acts, decisions, or judgment of the licensed physician." Ind.Code § 25–22.5–1–2(c). Indiana's law governing professional corporations as applied to physicians is designed to prevent those who are not physicians from owning or controlling a business that is the practice of medicine. See Ind. Code §§ 23–1.5–2–4 (directors of professional corporation and all officers other than secretary and treasurer must be qualified to ren-

der professional services), 23–1.5–3–1 (defining qualified shareholders for professional corporation). None of the directors or officers of CSC is a licensed physician.

■ This court is not charged with enforcing Indiana's laws regulating the practice of medicine. How the State of Indiana would evaluate CSC's arrangements with Dr. Mukhtar and other health care professionals in relation to those laws is not relevant here, and the court expresses no view on those questions of state law. The Indiana laws reflect a state's compromises among competing professional and business considerations that are quite separate from the federal policies reflected in federal employment discrimination law. For purposes of federal employment discrimination law, neither the parties' labels nor other business influences can be controlling. See *E.E.O.C. v. First Catholic Slovak Ladies Ass'n*, 694 F.2d at 1070 (whether person is protected by ADEA "should not center on the label which the organization has chosen to give to the position"). For purposes of federal employment discrimination law, this relationship was in substance an employment relationship.

## II. The Single Integrated Enterprise Issue

The conclusion that Dr. Mukhtar was an employee of CSC is not enough to show subject matter jurisdiction in this action. The ADEA applies only to "a person engaged in an industry affecting commerce who has twenty or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year." 29 U.S.C. § 630(b).

Plaintiff suggests that CSC alone should qualify as an employer under the ADEA. The Seventh Circuit held in *Zimmerman v. North American Signal Co.*, 704 F.2d 347, 353–54 (7th Cir.1983), that an hourly worker may be counted as an employee only on the days the employee actually works or is on paid leave. Under that approach, small businesses with more than twenty hourly workers on the payroll at the same time do not necessarily qualify as employers under the ADEA. The E.E.O.C. recently asked the Seventh Circuit to reconsider this issue, but

the Seventh Circuit adhered to *Zimmerman*. *E.E.O.C. v. Metropolitan Educational Enterprises, Inc.*, 60 F.3d 1225, 1229–30 (7th Cir. 1995) (acknowledging circuit split and declining to overrule *Zimmerman* ). Plaintiff also suggests that CSC would meet the standard on its own if the two physicians (Drs. Mukhtar and Gormley) and all officers of the company were counted as employees. However, plaintiff has not explained his count, nor is there any basis on this record for treating more than one officer—namely, Eric Beckwith—as an employee. See *Zimmerman*, 704 F.2d at 351–52 (directors and officers who received no salary and were not active in business were not employees for purposes of ADEA); cf. *E.E.O.C. v. First Catholic Slovak Ladies Ass'n*, 694 F.2d at 1070 (directors and officers who performed traditional employee duties and drew salaries were employees for purposes of ADEA). Standing alone, CSC does not qualify as an "employer" under the ADEA.

■ Dr. Mukhtar also contends that the court should deem CSC and two other related corporations to be a single integrated enterprise. If CSC is considered to be part of a single integrated enterprise that includes Anderson Service Corporation and Muncie Service Management Corporation, that enterprise satisfies the twenty employee requirement of the ADEA. The Seventh Circuit explained the integrated enterprise theory as applied to the ADEA in *Rogers v. Sugar Tree Products, Inc.*:

In determining whether a single employer exists, the court should consider:

(1) Interrelation of operations, *i.e.*, common offices, common record keeping, shared bank accounts and equipment.

(2) Common management, common directors and boards.

(3) Centralized control of labor relations and personnel.

(4) Common ownership and financial control.

[*York v. Tennessee Crushed Stone Ass'n*, 684 F.2d 360, 362 (6th Cir.1982).] Although the presence or absence of any one factor is not controlling, in light of the

ADEA's goal of remedying and eliminating age discrimination in the workplace, "control over the elements of labor relations is a central concern." *Armbruster v. Quinn,* 711 F.2d 1332, 1337 (6th Cir.1983).

7 F.3d at 582. With this standard in mind, the court considers the relationships among the three corporations at issue here.

 The three corporations are Illinois corporations with the same principal offices and the same resident agent. The stock of the three corporations is owned in exactly the same proportions among several members of the Beckwith family. Russell Beckwith and Vivian C. Beckwith are husband and wife, and they are the parents of Gregory M. Beckwith, R. Michael Beckwith, Eric M. Beckwith, Douglas Beckwith, and Paul Beckwith. In each corporation, Russell Beckwith owns 25.5 percent of the stock; Vivian L. Beckwith owns 25.5 percent; Gregory M. Beckwith owns 7.8 percent; R. Michael Beckwith owns 17.8 percent; Eric M. Beckwith owns 7.8 percent; Douglas Beckwith owns 7.8 percent; and Paul Beckwith owns 7.8 percent. Each of the three corporations also has the same officers and the same directors. In each corporation, Russell Beckwith is president; Vivian L. Beckwith is secretary/treasurer; and R. Michael Beckwith, Gregory M. Beckwith, and Douglas M. Beckwith are each vice presidents. Each officer is also a director of each corporation.

 The three corporations therefore have common ownership and financial control, as well as common management, directors, and boards. *Rogers* makes clear, however, that at least when the separate corporations are not parent and subsidiary, the presence of common ownership and control is not sufficient by itself to apply the integrated enterprise doctrine. 7 F.3d at 583. There must also be a sufficient degree of interrelation of operations and management, especially with respect to elements of labor relations and personnel.[1] On these issues, the evidence in this case shows that the three corporations are engaged in the same business under the same service mark—"Doctors Immediate Medcenter." Their accounting functions are all run from the same address, as shown by the Form 1099's sent to Dr. Mukhtar for 1994. The evidence also shows that physicians who work at the several facilities cover for one another, although they are paid separately for such work by the corporation that owns the facility where the work is performed. (There is no evidence that the physicians would enter into a separate "lease" or "sublease" with the owner of the facility where they covered for one another.) Both Dr. Mukhtar and Dr. Gormley, for example, worked at the Anderson and Muncie facilities, in addition to the CSC facility. Also, thirteen clinic staff employees of the three corporations worked at more than one facility in 1993 and 1994, and three worked at all three facilities, often during the same calendar months. Pl.Ex. 8.

The affidavit of Eric M. Beckwith asserts that he is the business manager of CSC but that he receives no salary from CSC. Instead, he is a salaried employee of Health Services Management, Inc., yet another Illinois corporation with the same principal office as the other three companies. See Pl. Ex. 9.[2] CSC pays Health Services Management, Inc. a fee for his services. Eric Beckwith asserts that "no other member of my family has any direct involvement in the operation of CSC" at the relevant times. He says that Michael Beckwith runs the business of Anderson Service Corporation and Gregory Beckwith runs the business of Muncie Service Management Corporation.

---

1. Under state law, of course, courts generally treat two corporations as distinct legal entities, but they may disregard the distinction and "pierce the corporate veil" to prevent fraud or unfairness to third parties. *E.g., McQuade v. Draw Tite, Inc.,* 659 N.E.2d 1016, 1020 (Ind. 1995). The Seventh Circuit's approach to parents and subsidiaries described in *Rogers* shows that the test for an integrated enterprise under the ADEA is distinct from the test for equitable piercing of the corporate veil under state law. See 7 F.3d at 582–83 (focus under ADEA is on common ownership, control, and operations, rather than on equitable considerations of fraud or injustice).

2. The record does not include information on the precise ownership and management of Health Services Management, Inc.

**944**

In light of all the other evidence before the court, this effort to isolate CSC from the sister companies is not persuasive. While Eric Beckwith seems to have day-to-day control of most aspects of CSC's business, the evidence shows that his control is hardly complete. Both the "lease" with Dr. Mukhtar and the termination notice were signed by Russell Beckwith, the president and principal owner of all the corporations. Eric Beckwith testified that although the decision to terminate Dr. Mukhtar's "lease" was his, he asked his father to sign the termination letter because he, Eric, would feel uncomfortable or awkward doing so because of his close working relationship with Dr. Mukhtar. The court does not find Eric Beckwith's testimony about his sensitivity to be persuasive or probable. The more reasonable interpretation of the evidence is that Russell Beckwith needed to be involved in major personnel decisions, such as hiring or firing a physician. At the very least, even if Russell Beckwith did not *need* to be involved in such decisions for CSC, Eric Beckwith effectively relinquished some control by asking his father to play a role in this decision. Russell Beckwith's central role as president, director, and principal shareholder of all the related corporations provides important evidence of central and interrelated operations with respect to important personnel and labor relations issues. Under *Rogers v. Sugar Tree Products,* therefore, CSC, Anderson Service Corporation, and Muncie Service Management Corporation constituted one "integrated enterprise" for purposes of the ADEA, and CSC was therefore an employer for purposes of the ADEA.

### Conclusion

On paper, the contractual relationship here was a "lease" between Dr. Mukhtar and one small corporation, CSC. For purposes of federal employment discrimination laws, however, the court must look to economic realities of the relationship, which show the relationship to have been one of employment. Similarly, while the owners of CSC may have had very good business reasons for establishing each clinic under the ownership of a separate corporation, the evidence here is sufficient to show that at least three clinics were operated as an integrated enterprise

that was large enough to qualify as an "employer" under the ADEA. Defendant's motion to dismiss for lack of subject matter jurisdiction is accordingly DENIED.

So ordered.