## NATIONAL LABOR RELATIONS BOARD *v.* UNITED INSURANCE CO. OF AMERICA ET AL.

No. 178. Argued January 23–24, 1968.—Decided March 6, 1968.*

*Dominick L. Manoli* argued the cause for the National Labor Relations Board, petitioner in No. 178 and respondent in No. 179. With him on the brief were *Solicitor General Griswold, Arnold Ordman* and *Norton J. Come.*

*Together with No. 179, *Insurance Workers International Union, AFL–CIO* v. *National Labor Relations Board et al.*, also on certiorari to the same court.

*Isaac N. Groner* argued the cause and filed a brief for the Insurance Workers International Union, AFL–CIO, petitioner in No. 179 and respondent in No. 178.

*Bernard G. Segal* argued the cause for the United Insurance Co. of America, respondent in both cases. With him on the brief were *Samuel D. Slade* and *Herbert G. Keene, Jr.*

*Shayle P. Fox* filed a brief for the American Retail Federation, as *amicus curiae,* urging affirmance.

MR. JUSTICE BLACK delivered the opinion of the Court.

In its insurance operations respondent United Insurance Company uses "debit agents" whose primary functions are collecting premiums from policyholders, preventing the lapsing of policies, and selling such new insurance as time allows. The Insurance Workers International Union, having won a certification election, seeks to represent the debit agents, and the question before us is whether these agents are "employees" who are protected by the National Labor Relations Act or "independent contractors" who are expressly exempted from the Act.[1] Respondent company refused to recognize the Union, claiming that its debit agents were independent contractors rather than employees. In the ensuing unfair labor practice proceeding the National Labor Relations Board held that these agents were employees and ordered the company to bargain collectively with the Union. 154 N. L. R. B. 38. On appeal the Court of Appeals found that the debit agents were independent contractors and refused to enforce the Board's order. 371 F. 2d 316 (C. A. 7th Cir.). The importance of the question in the context involved to the administration of the

---

[1] The National Labor Relations Act, as amended (61 Stat. 136, 73 Stat. 519, 29 U. S. C. § 151 *et seq.*), protects an "employee" only and specifically excludes "any individual having the status of an independent contractor." (§ 2 (3).)

National Labor Relations Act prompted us to grant the petitions of the Board and the Union for certiorari. 389 U. S. 815.

At the outset the critical issue is what standard or standards should be applied in differentiating "employee" from "independent contractor" as those terms are used in the Act. Initially this Court held in *NLRB* v. *Hearst Publications,* 322 U. S. 111, that "Whether . . . the term 'employee' includes [particular] workers . . . must be answered primarily from the history, terms and purposes of the legislation." 322 U. S., at 124. Thus the standard was one of economic and policy considerations within the labor field. Congressional reaction to this construction of the Act was adverse and Congress passed an amendment specifically excluding "any individual having the status of an independent contractor" from the definition of "employee" contained in § 2 (3) of the Act. The obvious purpose of this amendment was to have the Board and the courts apply general agency principles in distinguishing between employees and independent contractors under the Act.[2] And both petitioners and respondents agree that the proper standard here is the law of agency. Thus there is no doubt that we should apply the common-law agency test here in distinguishing an employee from an independent contractor.

Since agency principles are to be applied, some factual background showing the relationship between the debit agents and respondent company is necessary. These basic facts are stated in the Board's opinion and will be very briefly summarized here. Respondent has district offices in most States which are run by a manager who usually has several assistant managers under him.

---

[2] See 93 Cong. Rec. 6441–6442, 2 Leg. Hist. of the Labor Management Relations Act, 1947, p. 1537. See also H. R. Rep. No. 245, 80th Cong., 1st Sess., 18, 1 Leg. Hist., 1947, p. 309; H. R. Conf. Rep. No. 510, 80th Cong., 1st Sess., 32–33, 1 Leg. Hist., 1947, pp. 536–537.

Each assistant manager has a staff of four or five debit agents, and the total number of such agents connected with respondent company is approximately 3,300. New agents are hired by district managers, after interviews; they need have no prior experience and are assigned to a district office under the supervision of an assistant district manager. Once he is hired, a debit agent is issued a debit book which contains the names and addresses of the company's existing policyholders in a relatively concentrated geographic area. This book is company property and must be returned to the company upon termination of the agent's service. The main job of the debit agents is to collect premiums from the policyholders listed in this book. They also try to prevent the lapsing of policies and sell new insurance when time allows. The company compensates the agents as agreed to in the "Agent's Commission Plan" under which the agent retains 20% of his weekly premium collections on industrial insurance and 10% from holders of ordinary life, and 50% of the first year's premiums on new ordinary life insurance sold by him. The company plan also provides for bonuses and other fringe benefits for the debit agents, including a vacation-with-pay plan and participation in a group insurance and profit-sharing plan. At the beginning of an agent's service an assistant district manager accompanies the new agent on his rounds to acquaint him with his customers and show him the approved collection and selling techniques. The agent is also supplied with a company "Rate Book," which the agent is expected to follow, containing detailed instructions on how to perform many of his duties. An agent must turn in his collected premiums to the district office once a week and also file a weekly report. At this time the agent usually attends staff meetings for the discussion of the latest company sales techniques, company directives, etc. Complaints against an agent are investigated

by the manager or assistant manager, and, if well founded, the manager talks with the agent to "set him straight." Agents who have poor production records, or who fail to maintain their accounts properly or to follow company rules, are "cautioned." The district manager submits a weekly report to the home office, specifying, among other things, the agents whose records are below average; the amounts of their debits; their collection percentages, arrears, and production; and what action the district manager has taken to remedy the production "letdown." If improvement does not follow, the company asks such agents to "resign," or exercises its rights under the "Agent's Commission Plan" to fire them "at any time."

There are innumerable situations which arise in the common law where it is difficult to say whether a particular individual is an employee or an independent contractor,[3] and these cases present such a situation. On the one hand these debit agents perform their work primarily away from the company's offices and fix their own hours of work and work days; and clearly they are not as obviously employees as are production workers in a factory. On the other hand, however, they do not have the independence, nor are they allowed the initiative and decision-making authority, normally associated with an independent contractor. In such a situation as this there is no shorthand formula or magic phrase that can be applied to find the answer, but all of the incidents of the relationship must be assessed and weighed with no one factor being decisive. What is important is that the total factual context is assessed in light of the pertinent common-law agency principles. When this is done, the decisive factors in these cases become the following:

---

[3] See annotated cases in 55 A. L. R. 289 *et seq.* and 61 A. L. R. 218 *et seq.*

the agents do not operate their own independent businesses, but perform functions that are an essential part of the company's normal operations; they need not have any prior training or experience, but are trained by company supervisory personnel; they do business in the company's name with considerable assistance and guidance from the company and its managerial personnel and ordinarily sell only the company's policies; the "Agent's Commission Plan" that contains the terms and conditions under which they operate is promulgated and changed unilaterally by the company; the agents account to the company for the funds they collect under an elaborate and regular reporting procedure; the agents receive the benefits of the company's vacation plan and group insurance and pension fund; and the agents have a permanent working arrangement with the company under which they may continue as long as their performance is satisfactory. Probably the best summation of what these factors mean in the reality of the actual working relationship was given by the chairman of the board of respondent company in a letter to debit agents about the time this unfair labor practice proceeding arose:

> "if any agent believes he has the power to make his own rules and plan of handling the company's business, then that agent should hand in his resignation at once, and if we learn that said agent is not going to operate in accordance with the company's plan, then the company will be forced to make the agents final [sic].
>
> "The company is going to have its business managed in your district the same as all other company districts in the many states where said offices are located. The other company officials and I have managed the United Insurance Company of Amer-

ica's operations for over 45 years very successfully, and we are going to continue the same successful plan of operation, and we will not allow anyone to interfere with us and our successful plan."

The Board examined all of these facts and found that they showed the debit agents to be employees. This was not a purely factual finding by the Board, but involved the application of law to facts—what do the facts establish under the common law of agency: employee or independent contractor? It should also be pointed out that such a determination of pure agency law involved no special administrative expertise that a court does not possess. On the other hand, the Board's determination was a judgment made after a hearing with witnesses and oral argument had been held and on the basis of written briefs. Such a determination should not be set aside just because a court would, as an original matter, decide the case the other way. As we said in *Universal Camera Corp. v. NLRB,* 340 U. S. 474, "Nor does it [the requirement for canvassing the whole record] mean that even as to matters not requiring expertise a court may displace the Board's choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it *de novo.*" 340 U. S., at 488. Here the least that can be said for the Board's decision is that it made a choice between two fairly conflicting views, and under these circumstances the Court of Appeals should have enforced the Board's order. It was error to refuse to do so.

*Reversed.*

MR. JUSTICE BRENNAN and MR. JUSTICE MARSHALL took no part in the consideration or decision of these cases.