**COLLEGIATE BASKETBALL OFFICIALS ASSOCIATION, INC., Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent,**

**The Big East Conference, Intervenor.**

No. 87–3404.

United States Court of Appeals, Third Circuit.

Submitted Under Third Circuit Rule 12(6) Dec. 7, 1987.

Decided Dec. 29, 1987.

Alan D. Berkowitz, Janice H. Levin, Dechert Price & Rhoads, Philadelphia, Pa., for petitioner.

Linda Dreeben, William M. Bernstein, Elliott Moore, Roseymary M. Collyer, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Associate Gen. Counsel, Aileen A. Armstrong, Deputy Associate Gen. Counsel, N.L.R.B., Washington, D.C., for respondent.

Alvin M. Glazerman, Walter C. Hunter, Edwards & Angell, Boston, Mass., for intervenor.

Before GREENBERG, SCIRICA, and HUNTER, Circuit Judges.

## OPINION OF THE COURT

JAMES HUNTER, III, Circuit Judge:

Appellant Collegiate Basketball Officials Association (CBOA) appeals a National Labor Relations Board (Board) decision that The Big East Conference (Big East) did not violate section 8(a)(1) and (a)(5) of the National Labor Relations Act by refusing to bargain with the CBOA. The Board based its decision entirely on its finding that the officials who comprise the CBOA are independent contractors and not employees. The only question on review is whether that finding is supported by substantial evidence. We will affirm.

### I.

The CBOA is an organization of persons who referee college basketball games. For many years, these officials have worked under contracts negotiated by the CBOA with the Eastern College Basketball Association (ECBA). The ECBA, in turn, provides and supervises a basketball officiating service to members of the Eastern College Athletic Conference (ECAC). The ECAC is an unincorporated association of more than 200 four-year colleges, formed to facilitate the conduct of intercollegiate amateur athletics. The ECBA is an affiliate of the ECAC, its basketball officiating bureau. Each year, each ECAC member must choose whether it will purchase the services of the ECBA.

The Big East is an athletic conference composed of nine member schools of the ECAC. Formed in 1979, its members compete with each other in sixteen different sports, including men's basketball. From 1979 until 1984, the Big East used the officiating services provided by the ECBA. In late May or June, 1984, each Big East member informed the ECBA that it would stop using the ECBA's services. The Big East then established its own bureau to provide officials for its games, and offered contracts to a number of CBOA officials. Thirty of the 36 officials who had returned signed contracts by July, 1984, were former ECBA officials. Big East officials have continued to work a number of ECBA and other conference games.

The CBOA believes that the Big East is the successor employer to the ECBA. The CBOA therefore demanded that the Big East bargain with it as the collective bargaining representative of the Big East officials. When the Big East refused, the CBOA filed an unfair labor practice charge with the National Labor Relations Board.

Under the National Labor Relations Act, an employer commits an unfair labor practice when it "refuse[s] to bargain collectively with the representatives of his employees...." 29 U.S.C. § 158(a)(5). The Act excepts from its definition of employee "any individual having the status of an independent contractor...." 29 U.S.C. § 152(3). After a three-day hearing, the Administrative Law Judge (ALJ) dismissed the complaint, finding that the members of the CBOA were independent contractors and not employees of the ECBA. In an order dated December 1, 1986, the Board upheld the ALJ's decision and opinion in all respects except that the Board did not rely

on "the officials' capacity to affect their working conditions by negotiating through" the CBOA.

## II.

"The findings of the Board with respect to questions of fact if supported by substantial evidence on the record considered as a whole shall be conclusive." 29 U.S.C. § 160(e); *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488, 71 S.Ct. 456, 464, 95 L.Ed. 456 (1951). The CBOA reminds this Court that its "review of the Board's application of legal precepts to the facts is plenary." *Allbritton Communications Co. v. NLRB*, 766 F.2d 812, 817 (3d Cir. 1985). However, this Court has treated the determination of employees status as a question of fact. *See id.* at 819. Such treatment is consistent with the factual nature of the issue.

Whether the officials are employees or independent contractors under the Act is a question of common law agency. *NLRB v. United Insurance Co.*, 390 U.S. 254, 258, 88 S.Ct. 988, 990, 19 L.Ed.2d 1083 (1968). The officials' status is determined by the degree to which the ECBA may intervene to control the details of the officials' performance, commonly referred to as a "right to control" test. *Allbritton*, 766 F.2d 812, 818 (3d Cir.1985); *NLRB v. A. Duie Pyle, Inc.*, 606 F.2d 379, 382 (3d Cir. 1979). To make this determination, this Court examines a number of factors, including

> "the type of services rendered, the possibility of realizing additional profits through the exercise of entrepreneurial skill and the ownership and maintenance" of equipment. This inquiry canvasses both "the language of the contract" and "the practice of the parties, the skill required ..., the mode of compensation for additional duties, and the methods of applying corrective and disciplinary measures."

*A. Duie Pyle*, 606 F.2d at 382 (quoting *News–Journal Co. v. NLRB*, 447 F.2d 65, 68 (3d Cir.1971)). To render a decision, "all of the incidents of the relationship must be assessed and weighed with no one factor being decisive." *United Insurance Co.*, 390 U.S. at 258, 88 S.Ct. at 991.

## III.

The CBOA accepts only members of the International Association of Approved Basketball Officials (IAABO), who must pass a written test and a floor test conducted by the IAABO. Most if not all applicants have officiated high school games. A qualified applicant is rated and ranked by the CBOA. The ECBA then chooses the number of officials it needs, most of which are accepted in order of rank. A few each year are recommended by the ECBA; the CBOA accepts these few regardless of ranking. CBOA members pay dues to the organization. Members are divided into varsity officials and junior varsity officials. An official progresses from junior varsity to varsity status based on his annual ratings, and can be demoted based on those ratings. A junior varsity official who does not achieve varsity status within six years loses his membership.

CBOA officials work from 3 to 55 games per year, the average official working 30. The basketball season runs from November to March. Thus, most officials have other jobs and many officiate at non-ECBA games. The officials are paid a lump sum per game by the home team. This sum is calculated by the ECBA according to an agreed formula, and includes a per diem and an allowance for travel expenses. The ECBA, with the exception of one team, neither deducts nor withholds any taxes for the officials. The officials contract to hold the ECBA harmless for their injuries and must warrant that they have obtained full medical insurance. (One of the functions of the CBOA is to provide such insurance.) Officials pay for their own uniforms and any fees due the CBOA. The ECBA does handle grievances, which range from complaints about late payments and inadequate travel allowances, to complaints about the number of assignments. Each official must pay the ECBA a certain sum based on his membership status and number of assignments. The reported purpose of this

assessment is to share the costs of the assignment procedure with the ECBA.

Officials are rated annually according to a formal process, which is part of the ECBA contract and is contained in the CBOA constitution. Each official's rating is determined according to the following scale: 40% from the ratings of ECBA coaches; 40% from the ratings of fellow officials; 10% from ratings conducted by the ECBA or persons it hires; 5% for attending a clinic sponsored by the ECBA; and 5% for passing a written examination composed by the Collegiate Commissioners Association (CCA) and administered by the ECBA. The ratings are compiled annually, at the end of the season.

Under the terms of its contract with the CBOA, the ECBA promises to assign only CBOA members to officiate its games. A clause in the contract allows the ECBA to use non-CBOA officials if qualified CBOA officials are not available, but this has occurred rarely. The assignment procedure begins in the spring, when the ECBA mails "availability cards" to the officials. An official can "close" dates—prevent the ECBA from assigning him a game on a particular date—by marking the appropriate place on the card. An official can close any number of dates, but closing a large number of dates may affect an official's rating. A date may be closed for any reason except the acceptance of non-ECBA officiating assignments. In order to accept another assignment, an official must "request an accommodation" in writing before June 30. Responses are given in the last week in July, and denials are reviewable by the ECBA Commissioner in his discretion. All dates not closed are considered open until October 1st. After this time, officials can close dates without restriction, provided that they so inform the ECBA. All dates not closed are considered open, and an official must accept an ECBA assignment for that date.

Sometime in August or September, the ECBA sends each official a contract with his game assignments. Those officials rated most highly generally receive the most and best games, but the ECBA also assigns games—especially "quality" games—based on its independent assessment of an official's "experience and expertise." Although according to the contract officials must accept the assigned dates, the ECBA has allowed officials to return the contracts indicating which dates they do and do not accept. Dates not accepted are reassigned. Shortly before an assigned date, an official receives a mailing telling him the location and time of the game, as well as his fee. If an official cannot work a game, the official must notify the ECBA Commissioner, who reassigns the game. An official may not find a substitute on his own. The Commissioner may cancel any assignment in his sole discretion, although this has rarely if ever occurred.

An official must be ready ninety minutes before a game. The decisions of the officials during the course of a game are final and unappealable. The ECBA supervises the officials in indirect ways. The ECBA requires the officials to follow the National Collegiate Athletic Association (NCAA) and CCA rules (as does the CBOA constitution). The ECBA requires the officials to wear the NCAA uniform. The ECBA holds a clinic at the beginning of the season at which the ECBA emphasizes certain NCAA/CCA rules, both rules of the game and rules of conduct. At the clinic, the ECBA also discusses how the officials should handle certain plays as well as certain non-official situations, such as communications with the teams or the media. The officials must pay their own way at the clinic. The ECBA sends bulletins during the year that follow the same pattern and serve the same purpose as the clinic. The ECBA supervisors at the games will critique the officials' performance and make suggestions both after the game and at half-time. The team coaches do likewise, with varying degrees of specificity.

Officials may be terminated by the ECBA if they fall into the lower 15% of the ratings scale or if they fail to pay the ECBA assessment. They may be terminated if they fail the medical examination administered by the CBOA. They may be terminated if they are not members in good standing with the CBOA. The ECBA Com-

missioner has the discretion to terminate any official if he deems it in the best interests of the ECBA. His discretion is unreviewable, but also has not been exercised.

## IV.

The ECBA's contract with the officials provides that the officials are independent contractors. The contract further provides that the CBOA will "train and maintain" capable officials "in cooperation with the ECBA." It contains no recognition clause naming the CBOA as the bargaining representative of the officials. The Board found nothing in the employment relationship to contradict either the cooperative nature of the venture, or the contract's characterization of the officials as independent contractors. This Court finds the Board's characterization of the employment relationship between the ECBA and the officials well-supported.

The ratings process is central to the employment relationship. The Board's characterization of that process as "a cooperative venture whose purpose is to continue and improve the skill levels of officials," rather than as a means of control, is supported by the record. Even accepting the CBOA's characterization of the ECBA's influence, the CBOA exercises control over 40% of an official's ratings. The CBOA also sends a representative to the annual ECBA ratings meeting. Through the ratings, the CBOA has significant participation in many aspects of the employment relationship: who is employed, based on the lower 15% of the ratings; the quality of each official's employment, based on his rank in the ratings; and, whether an official may referee varsity or junior varsity games. In fact, during one season in which the CBOA and the ECBA failed to agree on a contract, the CBOA advertised the services of the officials by emphasizing the cooperative enterprise the ratings system creates.

The officials, through the CBOA, exercise more direct control over the hiring and firing of officials. While the ECBA determines the number of officials who will be hired, it hires most according to a ranking of applicants prepared solely by the CBOA. The CBOA retains the right not to hire ECBA-chosen applicants, making them generally ineligible for ECBA work. The CBOA also does retain a limited right to fire members "not in good standing," a determination apparently not subject to ECBA review. Thus, in two ways it can exercise a "veto" over ECBA employment decisions. On the whole, the officials, via the CBOA, have significant influence over the hiring and firing of their coworkers, a power an employee rarely exercises in conjunction with an employer. That the ECBA and the officials, in the assessments, share the cost of the assignment system, further argues the cooperative nature of the enterprise. As the Board notes, "[i]t would be unusual for an employer to require its employees to pay it an assessment based on the number of hours worked."

The Board accurately described the officials as sellers of "skill and expertise." The ECBA does not employ inexperienced persons and unilaterally train them. The officials have received some basic training at the high school level. They also must be IAABO certified. Their prior training is sufficient to qualify them to officiate junior varsity games immediately. As noted above, the on-the-job training provided through the ratings process is done cooperatively by the ECBA and the CBOA. That officials may not choose their own substitutes—usually indicative of employee status—here argues the uniqueness of the official's skill. Simply, the officials are not fungible. That each official must show up ninety minutes before a game reflects the difficulty of substitute performance when dealing with a specialized skill. *Cf. News-Journal Co. v. NLRB*, 447 F.2d 65, 67 (3d Cir.1971) (employer's control over hours not indicative of employee status where job of newspaper delivery requires intricate scheduling). The skill required to be a varsity basketball official combined with the fact that the ECBA alone does not impart such skill supports the Board's decision.

The Board found the ECBA to be a "principal [that] issues instructions which relate

to the ends to be achieved by the agent rather than how the ends are to be achieved." In part, this finding is based on the questionable conclusion that the ECBA exercises its supervision over the officials only annually, when it compiles the ratings. Yet, some of the evidence which argues against finding "annual" supervision undercuts the CBOA's arguments as well. The ECBA controls or has the right to control the number of assignments based on its assessment of the quality of an official; the officials merely offer dates. Yet, this relationship is more in keeping with independent contractor status—where, for example, only a few of a number of bidders are chosen—than with employee status, where an employer typically uses all its workers, though choosing their tasks. The assigned system also belies the impermanency of the relationship between the officials and the ECBA, another indicator of independent contractor status.

Several minor points further indicate independent contractor status. The CBOA has an ongoing relationship with nonECBA schools: it assigns for six independent schools in Pennsylvania, and an association of two-year colleges. That officials are not required to accept reassignment, though needed by the ECBA, is a significant limit on the ECBA's authority. And, to the extent that NCAA rules are externally imposed, the ECBA bulletins do little more than remind the officials of rules the ECBA feels are not being enforced. Though the ECBA calculates the amount of compensation for expenses such as travel, the formula is worked out in advance by agreement.

The decision is, however, a close one. The ECBA exerts significant supervisory control. While ratings occur annually, criticism—supplied by the ECBA and its coaches—occurs at the earliest convenient moment, half-time or postgame. (Evidently, the officials must keep themselves available for criticism.) Since these criticisms become part of the annual rating, the criticism likely has immediate impact on an official's performance. Also, the influence of the annual clinic is increased by the fact that attendance is 5% of an official's annual rating, making attendance all the more likely.

The ECBA seeks to minimize its influence through the ratings and the bulletins by arguing that it simply applies the rules laid down by the NCAA and CCA, much like an employer who must follow government regulations. *See NLRB v. A. Duie Pyle*, 606 F.2d 379, 385 (3d Cir.1979). Even apart from the ECBA's ability to emphasize or interpret the rules, this argument fails. The ECBA is part of the ECAC. The ECAC has chosen to participate in the NCAA. Adherence to the NCAA rules is therefore not imposed by an external force, as with a government regulation. That the CBOA has likewise chosen to abide by the NCAA rules is less significant: once the major schools have chosen to participate in the NCAA, the officials have little choice but to learn the rules the schools want applied.

The ECBA exerts significant control over the CBOA in other ways. The ECBA influences the major part of the ratings process, which affects all aspects of an official's employment. Only those approved by the ECBA may be admitted into the CBOA, giving the ECBA a "veto" over CBOA membership. The ECBA can fire the lower 15% of the officials, a fact made more significant by its degree of influence in the ratings process. The ECBA, through its Commissioner, has the power to fire an official at any time. That he has not exercised this power is only partly relevant, as he still retains the *right* to fire, and thus a right to control, the officials. Also, the ECBA does retain the sole power over the assignments of games, the actual "hiring" at issue.

That the officials' rulings are not appealable has more to do with basketball than the employment status of the referees. Appeal of rulings mid-game would slow the game; appeal of rulings after the game would change the finality of the closing buzzer. Both changes are undesirable primarily because they alter the entertainment value of the game as a spectator sport, and secondarily because they might pose additional difficulties for the coaches.

The finality of the officials' decisions thus has little to do with the officials' status as independent contractors.

The Board found the officials, by keeping a large number of dates open, can increase their income. Entrepreneurial interest is a prime indicator of independent contractor status. *Allbritton Communications Co. v. NLRB*, 766 F.2d 812, 818 (3d Cir.1985). The attempt to find entrepreneurship here is simply unavailing. An official has no guarantee of being employed on any open date, and opening a date for the ECBA means closing that date to other business opportunities. The attempt to find this choice of opportunities itself entrepreneurial ignores the fact that the ECBA has a priority over all other conferences and that the officials must seek the ECBA's permission to work for "competing" leagues. The significance of the official's freedom to accept other assignments after October 1st ignores the likelihood that, as the season begins in November, other schools may behave like the ECAC and not wait to find officials.

In Revenue Ruling 57–119, 1957–1 C.B. 331, the IRS found a college athletic association's officials to be employees for the purpose of federal withholding. The Board distinguishes this ruling because, on the facts presented to the IRS, the officials could be terminated at any time during the season and were required to file reports after each game. There was also no evidence that these officials had any ability to hold unavailable certain dates. The tax ruling is not so easily distinguished, however. The ECBA does, through the Commissioner, retain the right to fire at any time. That the officials in the ruling had to make reports after games—reports on the rules violations that occurred during the game and on general "sportsmanship"—is not very different from the fact that CBOA coaches must be available after and in the middle of a game for ECBA and coach criticism. The tax court's ruling substantially undercuts the Big East's reliance on the fact that, with one exception, no school withholds taxes from an official's payment. However, the private, advisory ruling of a tax agency has little influence on this labor issue.

One minor point also argues employee status. The uniforms the officials wear are chosen by the NCAA/CCA. The jackets, in fact, carry the CCA insignia. If we viewed the question from the officials' point of view, this Court might reasonably conclude that the officials feel like employees: they must dress as their employer dictates, behave on and off the court as it dictates, and make their decisions according to its rules; that they actually call the game reflects less their independence than their place within the larger scheme of "producing" a competitive basketball game. The decision, however, is not a subjective one. The Board's characterization of an employment relationship must reflect all the evidence. Reviewing that characterization, this Court must examine the record as a whole, and not as it supports the viewpoint of either party.

## V.

Officiating ill fits the usual distinction between independent contractors and employees. Emphasis on whether the ECBA supervises only the result of the official's job, versus how that result is achieved, makes little sense when dealing with a specialized skill: here, the "job" is "how it gets done." The characterization of the officials as employees or independent contractors thus contains an element of policy-making, which is best left to the Board. Insofar as the characterization involves factfinding, the Board has chosen between two rational, conflicting views of the record. This Court is therefore bound by the Board's finding that the officials are independent contractors. The ECBA was therefore never an employer, and the CBOA never a labor organization, so that the Big East committed no unfair labor practice when it refused to bargain as a successor employer. We will affirm the decision of the Board as supported by substantial evidence on the record as a whole.