# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued January 8, 2016                    Decided April 19, 2016

No. 14-1247

LANCASTER SYMPHONY ORCHESTRA,
PETITIONER

v.

NATIONAL LABOR RELATIONS BOARD,
RESPONDENT

THE GREATER LANCASTER FEDERATION OF MUSICIANS,
LOCAL 294, AMERICAN FEDERATION OF MUSICIANS,
INTERVENOR

———

Consolidated with 14-1272

———

On Petition for Review and Cross-Application
for Enforcement of an Order of
the National Labor Relations Board

———

*Jill S. Welch* argued the cause and filed the briefs for petitioner.

*Barbara A. Sheehy*, Attorney, National Labor Relations Board, argued the cause for respondent. With her on the brief were *Richard F. Griffin*, *Jr.*, General Counsel, *John H. Ferguson*, Associate General Counsel, *Linda Dreeben*,

Deputy Associate General Counsel, and *Usha Dheenan*, Supervisory Attorney.

*Jeffrey R. Freund* and *Patricia Polach* were on the brief for intervenor in support of respondent.

Before: TATEL and PILLARD, *Circuit Judges*, and WILLIAMS, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* TATEL.

TATEL, *Circuit Judge*: The National Labor Relations Act guarantees employees, but not independent contractors, the right to join a union. In this case, the National Labor Relations Board ruled that musicians in the Lancaster, Pennsylvania, regional orchestra are employees and thus entitled to join a union. Arguing that its musicians are in fact independent contractors, the Orchestra petitions for review. For the reasons set forth below, we deny the petition and grant the Board's cross-application for enforcement.

**I.**

Every year the Lancaster, Pennsylvania, Symphony Orchestra offers a series of classical music programs, each made up of four or so concerts. Before the beginning of each season, the Orchestra sends information packets to musicians inviting their participation. The packets list the program and rehearsal schedules for the coming year and announce the rate of pay for participating musicians. The packets also describe the Orchestra's policies on a variety of issues, including attendance, seating, and availability of sheet music.

Musicians who wish to perform select one or more programs and sign a Musician Agreement Form. That form, which covers a single season, states that musicians will work

as independent contractors, that they will be paid for each rehearsal or concert they attend, and that they will have no taxes withheld from their pay. Participating musicians must conform to the Orchestra's etiquette standards for both rehearsals and concerts. During rehearsals, musicians must maintain good playing posture and confine conversation to topics concerning the rehearsal. They must not cross their legs, talk, or practice while the conductor is on the podium, or interfere with the concentration of other musicians. The list of rules for concerts is far longer: musicians must warm up quietly, remain silent after the concertmaster signals for tuning, maintain good posture and attentive appearance throughout the performance, refrain from crossing their legs, remain still until the conductor lowers his hands, and when the conductor signals for the orchestra to acknowledge applause, stand, face the audience, and smile. Musicians must also abide by the Orchestra dress code: white tie for men and black formal wear for women. Musicians may attend meetings of the orchestra committee, which includes board members and the CEO, and which addresses issues such as dress, lighting, and attendance.

Seeking to represent the Orchestra's musicians, the Greater Lancaster Federation of Musicians, Local 294 filed a petition for certification pursuant to NLRA section 9(c). *See* 29 U.S.C. § 159(c). The Orchestra challenged the petition, arguing that its musicians were independent contractors and so had no right to join a union. *See NLRB v. United Insurance Co. of America*, 390 U.S. 254, 255 (1968) (explaining that "'employees' . . . are protected by the [Act, but] 'independent contractors' . . . are expressly exempted"); *see also* 29 U.S.C. § 152(3) ("The term 'employee' . . . shall not include . . . any individual having the status of an independent contractor."). Following a hearing at which both the Orchestra's CEO and principal trombonist testified, the Regional Director

concluded that the musicians were independent contractors and dismissed the petition. The Board disagreed. Emphasizing the Orchestra's substantial "control" over the musicians and their limited "entrepreneurial opportunity," as well as that the musicians' work "is part of the Orchestra's regular business," the Board concluded that they qualify as employees. *Lancaster Symphony Orchestra*, 357 N.L.R.B. No. 152 (2011). The Board then conducted an election, which the Union won. After jumping through a few procedural hoops not relevant to the issue before us, the Orchestra petitioned for review. The Board cross-applied for enforcement, and the Union intervened in support of the Board.

## II.

We begin with the decidedly unharmonious standards that determine the outcome of this case. "Although the Board must decide in the first instance whether individuals claiming the protection of the [Act] are employees or independent contractors, the Act requires the Board to resolve that question by reference to the common law of agency." *C.C. Eastern, Inc. v. NLRB*, 60 F.3d 855, 858 (D.C. Cir. 1995) (citing *United Insurance*, 390 U.S. at 256). In conducting that inquiry, the Board, like this court, considers the factors set forth in section 220(2) of the Restatement (Second) of Agency. *FedEx Home Delivery v. NLRB*, 563 F.3d 492, 496 & n.1 (D.C. Cir. 2009). That section lists ten factors:

> (1) "the extent of control" the employer has over the work;
> (2) whether the worker "is engaged in a distinct occupation or business";
> (3) whether the "kind of occupation" is "usually done under the direction of the employer or by a specialist without supervision";
> (4) the "skill required in the particular occupation";

(5) whether the employer or worker "supplies the instrumentalities, tools, and the place of work for the person doing the work";

(6) the "length of time for which the person is employed";

(7) whether the employer pays "by the time or by the job";

(8) whether the worker's "work is a part of the regular business of the employer";

(9) whether the employer and worker "believe they are creating" an employer-employee relationship; and

(10) whether the employer "is or is not in business."

Restatement (Second) of Agency § 220(2). In addition to these factors, the Board, also like this court, looks to see whether the workers have a "significant entrepreneurial opportunity for gain or loss." *Corporate Express Delivery Systems v. NLRB*, 292 F.3d 777, 780 (D.C. Cir. 2002) (internal quotation marks omitted).

Because applying "the law of agency to established and undisputed findings of fact 'involve[s] no special administrative expertise that a court does not possess,'" *C.C. Eastern, Inc.*, 60 F.3d at 858 (alteration in original) (quoting *United Insurance*, 390 U.S. at 260), we "need not accord the Board's decision that special credence which we normally show merely because it represents the agency's considered judgment," *id.* (internal quotation marks omitted). That said, because "[d]rawing the distinction requires an exercise of judgment about . . . facts," *Corporate Express Delivery Systems*, 292 F.3d at 779—to which we would ordinarily defer, *see International Longshoremen's & Warehousemen's Union, Local 62-B v. NLRB*, 781 F.2d 919, 923 (D.C. Cir. 1986) ("[W]e must defer to the Board's conclusion" "[t]o the

extent that the Board decisions reflect conclusions as to factual matters," provided they are supported by substantial evidence.)—we do not "review the Board's determination *de novo*," *C.C. Eastern, Inc.*, 60 F.3d at 858. Instead, we take a "middle course," *Corporate Express Delivery Systems*, 292 F.3d at 779, and "will . . . uphold the Board if at least it can be said to have made a choice between two fairly conflicting views," *FedEx Home Delivery*, 563 F.3d at 496 (internal quotation marks omitted).

With these standards in mind, we begin with the Restatement factors and consider how they apply to the facts of this case. In our view, some point toward employee status, some toward independent contractor status, and one in no clear direction at all. We consider each category in turn.

The first factor supporting employee status—"the extent of control" the Orchestra exercises over the musicians, Restatement factor one—requires that we examine "the extent of the actual supervision exercised by a putative employer over the means and manner of the workers' performance." *C.C. Eastern, Inc.*, 60 F.3d at 858 (internal quotation marks and emphasis omitted). In this case, record evidence demonstrates that the Lancaster Orchestra regulates virtually all aspects of the musicians' performance. It controls their posture, including prohibiting them from crossing their legs, and requires them to remain attentive throughout the performance. Musicians must confine conversations during rehearsals to matters concerning the rehearsal, and they may not talk at all during tuning or when the conductor is on the podium. Musicians must warm up quietly and never interfere with the concentration of others. And when the conductor signals for the orchestra to acknowledge applause, the musicians must stand immediately, turn to face the audience, and smile. The Orchestra, moreover, enforces these rules. For

example, one musician was reprimanded after she left her seat during a rehearsal in order to talk to a colleague.

Even more significant, the Lancaster Orchestra's conductor exercises virtually dictatorial authority over the manner in which the musicians play. The principal trombonist testified that the conductor determines when musicians come in, as well as their volume and pitch. Asked whether musicians could "use [their] independent discretion to play louder, if [they thought] it sound[ed] better," the trombonist responded "[o]nly initially" but "[n]ot after" the conductor directs otherwise. Hr'g Tr. 117. The conductor may also "explain the technique that he wants [musicians] to use, which may be specific to [a certain] instrument, a particular bow technique or a vibrato technique." *Id.* at 121.

Illustrating the extent of the conductor's control, the principal trombonist testified that the conductor's role is not simply to keep time while the musicians follow the music but rather to mold the performance into the conductor's personal interpretation of the score. During rehearsals, the conductor will "work[] all . . . artistic issues out the way he thinks that he has conceived, mentally conceived the music should sound." *Id.* at 118. What the conductor "mentally visualizes and hears is not necessarily what's on the page." *Id.* Leon Botstein, principal conductor of the American Symphony Orchestra, once put it this way:

> I think there's a big misunderstanding. Some people think, well, the composer wrote the music. Well, that's true. And there's a score. But depending when the score was written, the number of indications of what to do are very few. . . . The score is a map. It doesn't tell you how to drive . . . . It doesn't tell you how to make the trip. It only tells you where you're

going. So the score is a minimum number of instructions. . . . [T]his hype about doing only what the composer intended is a nonsense because nobody knows what the composer intended. . . . [P]utting a piece of music on the stage is always about [the] intention of the interpreter.

Leon Botstein, *The Art of Conducting Music*, Bigthink (May 10, 2010), http://bigthink.com/videos/the-art-of-conducting -music. Making this same point, Pulitzer Prize-winning music critic Tim Page observed that "Arturo Toscanini used to bring in Wagner's 'Siegfried Idyll' at about 15 minutes, while Glenn Gould . . . made a recording of the same piece that lasts 25 minutes . . . ." Tim Page, *I Hear a Symphony!*, Pulitzer, http://www.pulitzer.org/winners/6831 (last visited Apr. 19, 2016). And Maestro Lorin Maazel, former conductor of the New York Philharmonic, explained that the conductor plays this interpretive role even when performing his own music:

If I am conducting my own music it's rather embarrassing to admit that I couldn't write everything into the score—no-one can of course—because every time I finish a score I think there's nothing more to do: all we have to do is play it the way it is written, which of course is nonsense, and by the second bar you already realise that there is a need for an interpreter.

Colin Anderson, *An Interview with Lorin Maazel— Conducting, Composing . . . Casablanca!*, Classical Source, http://www.classicalsource.com/db_control/db_features.php ?id=6170 (last visited Apr. 19, 2016).

Given the foregoing, we think it quite clear that the Lancaster Orchestra closely supervises "the means and manner of [the musicians'] performance." *C.C. Eastern, Inc.*,

60 F.3d at 858 (internal quotation marks omitted). Indeed, the circumstances here are quite similar to those we faced in *Seattle Opera v. NLRB*, in which a group of backup choristers, called auxiliaries, who occasionally filled open roles in the Opera's five seasonal programs, sought to join a union. 292 F.3d 757, 760 (D.C. Cir. 2002). Like the musicians here, auxiliaries were required to "adhere to . . . attendance and decorum requirements[,] . . . receive artistic feedback[,] . . . follow musical and dramatic direction," and wear particular attire, in their case "costume fittings and make-up." *Id.* at 765. Given that "the Opera possesse[d] the right to control [auxiliaries] in the material details of their performance," we concluded, as had the Board, that they were employees. *Id.*

The Orchestra nonetheless insists that its musicians actually exercise a great deal of control over their performances, emphasizing that musicians practice before rehearsals, that principal musicians instruct members of their section, and that musicians may participate in the orchestra committee. We agree with the Board, however, that none of this "defeat[s] the Board's finding that the [Orchestra] is the ultimate authority to whom all the musicians must defer." Resp't's Br. 29. Musicians certainly practice on their own, but it is the conductor who directs how they perform. The principal trombonist testified that he gives instructions to the other trombone players only "if it's at the direction of something that the conductor has asked [the trombones] to work on." Hr'g Tr. 127. Finally, although musicians may participate in committee meetings, it is the Orchestra that establishes etiquette standards and the conductor who controls rehearsals and performances.

Two other Restatement factors also suggest that the Lancaster Orchestra's musicians qualify as employees. Their

work "is a part of the regular business of the employer," Restatement factor eight, because, as the Board explained, the musicians "are in the business of performing music, and thus their work is part of the employer's regular business." *Lancaster Symphony Orchestra*, 357 N.L.R.B. No. 152. Restatement factor seven—"method of payment"—is more complicated. To be sure, the Musician Agreement provides that musicians are paid by the job, which suggests that they function as independent contractors. Restatement (Second) of Agency § 220(2) cmt. j (Independent contractor status is more likely "if payment is to be made by the job and not by the hour."). As the Board pointed out, however, musicians are in effect paid by the hour because they receive additional pay for each fifteen minutes that a rehearsal or concert exceeds two and a half hours. *Lancaster Symphony Orchestra*, 357 N.L.R.B. No. 152 ("[M]usicians are not paid for the job . . . . Rather, they are paid based on the time they spend working for the Orchestra.").

Pointing in the opposite direction, three Restatement factors suggest independent contractor status. First, the occupation of musician clearly requires a high degree of skill. Restatement factor four; *cf.* Restatement (Second) of Agency § 220(2) cmt. h ("[W]ork which does not require the services of one highly educated or skilled" suggests an employer-employee relationship.). Second, the Orchestra engages musicians for only a short amount of time. Restatement factor six. The Musician Agreement covers one calendar year, and, within that year, many musicians choose to perform in only a few programs. Even those musicians who participate in all programs work just 140 to 150 hours a year for the Orchestra. Under the Restatement, "[i]f the time of employment is short," it suggests an employer-contractor relationship. Restatement (Second) of Agency § 220(2) cmt. j. Third, the Musician Agreement states that musicians work as

independent contractors and that the Orchestra will not withhold taxes, suggesting that both parties "believe" that the Orchestra's musicians are independent contractors. Restatement factor nine; *see also FedEx Home Delivery*, 563 F.3d at 498 n.4 (absence of withholding suggests "party intent" to form independent contractor relationship).

One Restatement factor points in no clear direction. Factor five considers who provides the worker's "instrumentalities, tools, and . . . place of work." If "a worker supplies his own tools," it offers "some evidence" of independent contractor status. Restatement (Second) of Agency § 220(2) cmt. k. Here, musicians provide the most critical tools, their instruments, thus suggesting contractor status. That said, as the Board explained, "the Orchestra supplies music, stands, chairs, and the concert hall," suggesting employee status. *Lancaster Symphony Orchestra*, 357 N.L.R.B. No. 152.

This brings us then to the extent of the worker's "entrepreneurial opportunit[ies]," *Corporate Express Delivery Systems*, 292 F.3d at 780 (internal quotation marks omitted), a factor which does not appear in the Restatement but which the Board and this court use in assessing whether workers are employees or independent contractors. The Board has explained the factor this way: "In addition to the factors set forth in Restatement § 220, the Board has considered, as one factor among the others, whether putative contractors have significant entrepreneurial opportunity for gain or loss. Related to this question, the Board has assessed whether purported contractors have the ability to work for other companies, can hire their own employees, and have a proprietary interest in their work." *FedEx Home Delivery*, 361 N.L.R.B. No. 55 (2014) (internal quotation marks and footnotes omitted). We too have considered "whether the

position presents the opportunities and risks inherent in entrepreneurialism." *FedEx Home Delivery*, 563 F.3d at 497. When examining entrepreneurial opportunities, we, like the Board, consider the opportunities created by the position to "take[] economic risk and ha[ve] the corresponding opportunity to profit from working smarter, not just harder." *Corporate Express Delivery Systems*, 292 F.3d at 780.

In considering what counts as entrepreneurial opportunity, we are guided by our decisions in *Corporate Express*, *id.*, and *FedEx*, 563 F.3d 492. In *Corporate Express*, we held that truck drivers who owned their own vehicles were employees because they "were not permitted to employ others to do the Company's work or to use their own vehicles for other jobs." 292 F.3d at 780 (citation omitted). In *FedEx*, by contrast, we held that drivers who owned their own vehicles qualified as independent contractors. 563 F.3d at 495. After pointing out that several Restatement factors indicated that the drivers were independent contractors, such as that FedEx did not control when the drivers worked, for how long, or when they could take breaks, we emphasized that the record revealed "many of the . . . characteristics of entrepreneurial potential." *Id.* at 498. Specifically, FedEx permitted the drivers to contract with the company to serve multiple routes, to hire their own employees and replacement drivers, to assign their employment obligations without company permission, and to use their vehicles for other jobs. *Id.* at 498–500.

Unlike in *FedEx*—but as in *Corporate Express*—the record here reveals few "characteristics of entrepreneurial potential." The Orchestra's musicians cannot contract to fill multiple chairs, nor can they "assign or sell their place in the symphony, or hire someone to fill their seat at any given rehearsal or performance." Resp't's Br. 33. Although the

Orchestra expects musicians who cancel at the last minute to help find a replacement, nothing in the record suggests they can profit from this process, say by hiring a replacement for less than the Orchestra pays them and pocketing the difference.

To be sure, the musicians do enjoy an entrepreneurial opportunity. As the Orchestra emphasizes, and as the principal trombonist acknowledged, musicians are "free to decline [performances with the Orchestra] and to perform with other symphonies in the area, and free to pursue other musical endeavors such as teaching." Pet'r's Br. 7; Hr'g Tr. 130–31. Musicians may even "back out of a series . . . and opt for a higher paying 'gig' with another symphony." Pet'r's Br. 27. Allowing musicians to take advantage of other opportunities, the Orchestra CEO testified, is "part of our dynamic . . . particularly if they get work that would pay more." Hr'g Tr. 33.

This limited entrepreneurial opportunity, however, provides only miniscule support for independent contractor status. Unlike FedEx drivers, the Orchestra's musicians—even with their ability to back out of a concert in order to take advantage of a more profitable gig—can increase their income only by accepting jobs with other employers. Were this quite minor entrepreneurial opportunity given much weight, it might lead to almost automatic classification of many part-time workers as contractors. Yet as the Board explained, "[p]art-time and casual employees covered by the Act often work for more than one employer." *Lancaster Symphony Orchestra*, 357 N.L.R.B. No. 152.

Summing up, then, we believe that the relevant factors point in different directions. On the one hand, the Orchestra's extensive control over the means and manner of musicians'

performance, the fact that musicians' work forms part of the Orchestra's regular business, the hourly pay, and the limited opportunities for entrepreneurial gain suggest, as the Board found, that the Orchestra's musicians qualify as employees. *Id.* On the other hand, the musicians' high degree of skill, the limited amount of time they work for the Orchestra, and the parties' beliefs regarding the nature of the relationship indicate that the Orchestra's musicians are independent contractors. Because the circumstances of this case thus present a choice between "two fairly conflicting views," we must defer to the Board's conclusion that the Orchestra's musicians are employees. *FedEx Home Delivery*, 563 F.3d at 496 (internal quotation marks omitted) ("[W]e will . . . uphold the Board if at least it can be said to have made a choice between two fairly conflicting views." (internal quotation marks omitted)).

Finally, the result we reach here does not conflict with the Eighth Circuit's decision in *Lerohl v. Friends of Minnesota Sinfonia*, 322 F.3d 486 (8th Cir. 2003). Although the court there held that musicians who played for a symphony orchestra on a temporary basis were independent contractors, *id.* at 493, that case arose in a very different situation than the one we face here. The musicians there claimed the orchestra had fired them in violation of two civil rights statutes—the Americans with Disabilities Act and Title VII of the Civil Rights Act of 1964—whose applicability turned on whether the musicians were employees. *Id.* at 489. Because the district court resolved that question at summary judgment, the Eighth Circuit's review of the employee/independent contractor issue was de novo. *Id.* at 487–88. Here, by contrast, we decide not how we would classify the musicians in the first instance, but only whether the Board confronted two fairly conflicting views. Because it did, our case law requires that we defer to the Board.

**III.**

For the foregoing reasons, we deny the Orchestra's petition for review and grant the Board's cross-application for enforcement.

*So ordered.*