# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

―――――

Argued November 16, 2018          Decided June 14, 2019

No. 18-1037

PENNSYLVANIA INTERSCHOLASTIC ATHLETIC ASSOCIATION,
INC.,
PETITIONER

v.

NATIONAL LABOR RELATIONS BOARD,
RESPONDENT

OFFICE AND PROFESSIONAL EMPLOYEES INTERNATIONAL
UNION,
INTERVENOR

―――――

Consolidated with 18-1043

―――――

On Petition for Review and Cross-Application
for Enforcement of an Order of
the National Labor Relations Board

―――――

*Maurice Baskin* argued the cause for petitioner. With him
on the briefs was *Tony W. Torain*.

*William E. Quirk* was on the brief for *amicus curiae*
National Federation of State High School Associations in
support of petitioner.

*Eric Weitz*, Attorney, National Labor Relations Board, was on the brief for respondent. With him on the brief were *Peter B. Robb*, General Counsel, *John W. Kyle*, Deputy General Counsel, *Linda Dreeben*, Deputy Associate General Counsel, and *Usha Dheenan*, Supervisory Attorney.

*Melvin S. Schwarzwald* argued the cause for intervenor in support of respondent. With him on the brief was *Timothy Gallagher*.

*George N. Davies* was on the brief for *amicus curiae* Association of Minor League Umpires, OPEIU Guild 332, in support of respondent.

Before: GARLAND, *Chief Judge*, and GRIFFITH and PILLARD, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* GRIFFITH.

GRIFFITH, *Circuit Judge*: This case asks whether lacrosse officials working for the Pennsylvania Interscholastic Athletic Association (PIAA) are employees subject to the National Labor Relations Act (NLRA) or independent contractors exempt from its protections. "[T]here is no shorthand formula or magic phrase that can be applied to find the answer . . . ." *NLRB v. United Ins. Co. of Am.*, 390 U.S. 254, 258 (1968). Rather, we must evaluate all aspects of the relationship using several factors from the common law of agency as a guide. Because the weight of the evidence demonstrates that the officials are independent contractors, we grant PIAA's petition.

I

PIAA develops and administers rules and procedures for 20 sports for more than 1,600 junior high and high schools in 12 geographic districts throughout Pennsylvania. It also selects officials to referee these sports. Officials must meet certain criteria to join and, once hired, must comply with certain rules to remain PIAA officiators.

In 2015, the Office and Professional Employees International Union (the "Union") filed a petition with the National Labor Relations Board (NLRB) seeking to represent approximately 140 individuals who officiate lacrosse games in Districts VII and VIII. PIAA contested the Union's right to hold an election on three grounds. First, PIAA claimed that it is a political subdivision of Pennsylvania, not an "employer," and is exempt from the NLRA. *See* 29 U.S.C. §§ 152(2), 158. Second, PIAA argued that the lacrosse officials are independent contractors, rather than "employees," and thus not protected by the Act. *See id.* §§ 152(3), 157. Finally, PIAA contended that even if it is an employer and the officials are employees, the officials were not eligible for certification as a bargaining unit because of the sporadic nature of their work.

The Regional NLRB Director rejected PIAA's arguments and directed that a Union election take place. PIAA petitioned the Board for review of the Regional Director's conclusions that it is an employer and the officials are employees. While that petition was pending, the Union conducted its election.

The Board took up only the issue of whether the officials are employees or independent contractors. *PIAA and Office & Prof'l Emps. Int'l Union*, 365 N.L.R.B. No. 107, at 1 n.2 (July 11, 2017); *see* J.A. 745 (explaining that the Regional Director's conclusion that PIAA was not a political subdivision did not raise "a substantial issue warranting review"). Two members voted to affirm the Regional Director's decision that the

officials are employees. The third dissented. *PIAA*, 365 N.L.R.B. No. 107, at 1.

PIAA subsequently refused to bargain with the Union, which the Board held was a violation of the NLRA. PIAA petitioned this court for review of the Board's conclusions, and the Board cross-applied for enforcement. We have jurisdiction over PIAA's petition pursuant to 29 U.S.C. § 160(f), and over the Board's cross-application pursuant to § 160(e).

II

Because the lacrosse officials who sought to join the Union are independent contractors, the NLRA does not apply to them, and we need not consider whether PIAA is a political subdivision or an employer.

A

Determining whether a worker is an employee or independent contractor for purposes of the NLRA is more art than science. *See United Ins.*, 390 U.S. at 258. As a guide, we and the Board look to ten factors from § 220(2) of the Restatement (Second) of Agency, as well as "whether the workers have a 'significant entrepreneurial opportunity for gain or loss.'" *Lancaster Symphony Orchestra v. NLRB*, 822 F.3d 563, 565-66 (D.C. Cir. 2016) (quoting *Corp. Exp. Delivery Sys. v. NLRB*, 292 F.3d 777, 780 (D.C. Cir. 2002)).[1]

---

[1] The ten Restatement factors are: (1) the extent of the employer's control over the work; (2) whether the worker "is engaged in a distinct occupation or business"; (3) "the kind of occupation," and whether it "is usually done under the direction of the employer or a specialist without supervision"; (4) the skill required for the occupation; (5) who "supplies the instrumentalities, tools, and the place of work"; (6) "the length of time for which the

"[N]o one factor" is *per se* determinative, however, and we cannot simply count up the factors on each side to declare a winner. *United Ins.*, 390 U.S. at 258; *FedEx Home Delivery v. NLRB* (*FedEx I*), 563 F.3d 492, 497 n.3 (D.C. Cir. 2009). Rather, we must "assess[] and weigh[]" "all of the incidents of the relationship . . . in light of the pertinent common-law agency principles" to identify the "decisive factors" in each particular case. *United Ins.*, 390 U.S. at 258.

As this analysis does not involve any "special administrative expertise that a court does not possess," *id.* at 260, we "need not accord the Board's decision that special credence which we normally show merely because it represents the agency's considered judgment," *Lancaster Symphony Orchestra*, 822 F.3d at 566 (quoting *C.C. Eastern, Inc. v. NLRB*, 60 F.3d 855, 858 (D.C. Cir. 1995)). "That said, because drawing [this] distinction requires an exercise of judgment about facts, to which we would ordinarily defer, we do not review the Board's determination de novo. Instead, we take a middle course, and will uphold the Board if at least it can be said to have made a choice between two fairly conflicting views." *Id.* (internal quotation marks, citations, and alterations omitted). However, we will reverse the Board if "the evidence, fairly considered, fails to support the conclusion that the [workers] are employees under traditional agency law principles." *N. Am. Van Lines, Inc. v. NLRB*, 869 F.2d 596, 604 (D.C. Cir. 1989).

---

person is employed"; (7) "the method of payment, whether by the time or by the job"; (8) whether the work is part of the employer's "regular business"; (9) whether "the parties believe they are creating the relation of master and servant"; and (10) whether the employer "is or is not in business." RESTATEMENT (SECOND) OF AGENCY § 220(2) (AM. LAW INST. 1958).

6

B

We reverse the Board because it failed to adequately account for the strength of the two aspects of this relationship that most strongly favor independent-contractor status: the few times on which PIAA actually pays the officials and the short duration of their employment.

The strongest factor supporting independent-contractor status is the fact that PIAA itself pays officials for *very* few games per year (factor 7); for the other games, officials are paid by the schools. During the 7-week regular season, officials typically work 2-3 games per week, though some work as few as 2 games total. Officials negotiate with and receive their per-game compensation directly from the schools. PIAA is not involved in the payment; it merely requires officials to sign contracts with the schools and stipulates that officials be paid with checks. In the 4-week postseason, by contrast, PIAA sets the per-game fee, selects officials, and pays them. *See* RESTATEMENT (SECOND) OF AGENCY § 220(2) cmt. j (payment by the job, rather than by the hour, favors contractor finding). The postseason includes both intra- and inter-district championships. The record does not indicate how many games or days officials work during the intra-district championships, but officials work at most 4 days during the inter-district championships. But even assuming that each game occurs on a separate day and that officials work a similar amount during the regular season and the intra-district championships, this amounts to, at most, 8-10 days of postseason work. In fact, the Association represented without contradiction that *it pays the average official for only 3 games per year*, *see* Tr. of Oral Arg. at 10:4-8, and officials who do not referee any postseason

games never receive payment from PIAA.[2] It simply cannot be—as the Board thought—that the extent to which PIAA controls how the officials are compensated by the schools "outweighs" this other compelling evidence. *See PIAA*, 365 N.L.R.B. No. 107, at 8-9.

The fact that PIAA lacrosse officials are eligible to earn money from this position for only 11 weeks per year (factor 6) also strongly supports independent-contractor status. As we have explained, the average official works, at most, 22-31 days per year (14-21 in the regular season and 8-10 in the postseason). Further, even under a generous estimate, officials work only 2 hours per game (based on record evidence that each game lasts about 1 hour, *see* Tr. of Oral Arg. at 20:19-21:5, and that officials must "[r]eport for duty at least 30 minutes before the scheduled start of" each game, J.A. 67). At oral argument, PIAA's counsel represented without contradiction that officials work "on average" only 20 hours per year. Tr. of Oral Arg. at 10:3-4. Whether 20 hours or 60, this heavily favors independent-contractor status. *See Lancaster Symphony Orchestra*, 822 F.3d at 568 (that musicians worked at most 140-150 hours per year favored independent-contractor status); *Pa. Acad. of the Fine Arts*, 343 N.L.R.B. 846, 846-47 (2004) (same, where models worked 1.5-226 hours per semester).

The Board erroneously discounted this short duration of the officials' employment because "PIAA registers officials

---

[2] During the 2014-2015 lacrosse season, 12 of the 42 officiating spots in the inter-district playoffs went to officials from Districts VII and VIII. The record does not specify the number of spots available in the intra-district playoffs and inter-district championship game, or the breakdown by district. Still, it seems highly unlikely that every one of the approximately 140 lacrosse officials registered in Districts VII and VIII refereed a postseason game.

annually," encourages re-registration, and "many officials work for PIAA for many years." *PIAA*, 365 N.L.R.B. No. 107, at 8. But unlike a worker who is automatically invited back year after year and, if available, assigned hours, PIAA officials must satisfy various criteria to re-register and there is no guarantee that registered officials will be selected to referee any games in a given year. *See In re Lancaster Symphony Orchestra*, 357 N.L.R.B. 1761, 1761 (2011).

Three other Restatement factors also suggest that PIAA's lacrosse officials are independent contractors, albeit not as strongly. Officiating lacrosse requires skill and expertise (factor 4), but not on the same level as a professional musician. *See* RESTATEMENT (SECOND) OF AGENCY § 220(2) cmt. h (work requiring education or skill suggests contractor relationship); *Lancaster Symphony Orchestra*, 822 F.3d at 568. The officials must provide their own equipment (factor 5), including whistles, pencils, and penalty markers. That suggests they are independent contractors but only weakly, for the cost of these supplies pales in comparison to that of a musical instrument or delivery truck. *See Lancaster Symphony Orchestra*, 822 F.3d at 569; *C.C. Eastern*, 60 F.3d at 858; *see also* RESTATEMENT (SECOND) OF AGENCY § 220(2) cmt. k (use of employer's tools suggests employee status, "especially if they are of substantial value"). And although PIAA designates the location of each postseason game, its member schools own and operate the fields. *See Lancaster Symphony Orchestra*, 822 F.3d at 569 (that orchestra supplied the concert hall favored employee status). As for the parties' understanding of their relationship (factor 9), numerous documents state that the officials are independent contractors, including the PIAA Constitution and Bylaws, the Officials' Manual, and the application to register as an official. Although PIAA unilaterally created these documents, which somewhat undercuts their value because the officials could not negotiate

the terms, *see Local 777, Democratic Union Org. Comm. v. NLRB*, 603 F.2d 862, 878-79 & n.45 (D.C. Cir. 1978), the officials still agreed to adhere to them. Moreover, the Association does not deduct withholdings on the very few days it issues the officials' paychecks. *See Lancaster Symphony Orchestra*, 822 F.3d at 568 (absence of withholding suggests the parties believe the workers are independent contractors). This outweighs the fact that PIAA provides the officials with certain types of insurance, which favors employee status. *See FedEx I*, 563 F.3d at 498 n.4.

A few factors suggest the officials are employees, but not as strongly as those that point towards classifying them as independent contractors. PIAA, a registered 501(c)(3), is in business (factor 10), and so is more likely to hire an employee than a non-market participant. Its aim is to create "a system of fair play for interscholastic sports," PIAA Br. 40, which requires both uniform rules and officials to enforce them, meaning the nature of its business and the officials' business is the same (factor 2). PIAA's attempt to separate this into two distinct categories—its "business of setting standards of fairness for amateur athletic competitions" and the officials' business of "officiating individual competitions," PIAA Br. 30—is unavailing. And because PIAA relies on these officials to carry out its purpose and their work frequently overlaps, the officials are part of PIAA's regular business (factor 8). *See Lancaster Symphony Orchestra*, 822 F.3d at 568.

That brings us to entrepreneurial opportunity. Because the officials have some opportunities to work "harder" but none to work "smarter," this favors an employee finding. *Id.* at 569 (quoting *Corp. Exp. Delivery Sys.*, 292 F.3d at 780). The officials can take on more games in the district in which they are registered. They can accept other referee positions, although PIAA has a near-monopoly on junior and high school

level lacrosse in Pennsylvania, and there is no evidence in the record that any official has accepted another lacrosse refereeing position in Pennsylvania or elsewhere. These chances to work "harder" signify some opportunity for entrepreneurialism, but they "provide[] only miniscule support for [independent-contractor] status." *Id.* Far more important is whether officials have the chance to work "smarter." They do not. Officials have no control over the length of the games they referee, *see Corp. Exp. Delivery Sys.*, 292 F.3d at 780, and they may not hire assistants, assign games to others, or find cheaper replacements and pocket the difference, *see FedEx I*, 563 F.3d at 499-500. Combined, the evidence demonstrates only "limited opportunit[y] for entrepreneurial gain," which favors an employee finding. *Lancaster Symphony Orchestra*, 822 F.3d at 570.[3]

That leaves us with the question of PIAA's control and supervision over the "means and manner" of the officials' work, and whether such work is usually done in the locality under an employer's supervision or by a specialist without supervision (factors 1 and 3). *Id.* at 566 (quoting *C.C. Eastern*, 60 F.3d at 858). In some respects, that control is significant and points towards employee status: PIAA dictates how to become

---

[3] The Board relied on the test for entrepreneurial opportunity that it articulated in *FedEx Home Delivery*, 361 N.L.R.B. 610 (2014). *See PIAA*, 365 N.L.R.B. No. 107, at 4, 10-14. After argument, PIAA submitted a letter pursuant to Rule 28(j) notifying us that in *SuperShuttle DFW, Inc.*, 367 N.L.R.B. No. 75 (Jan. 25, 2019), the Board overruled that portion of *FedEx* and articulated a new approach for how to treat entrepreneurial opportunity. Despite this change, we see no need to remand. Whether the Board's approach has indeed changed is immaterial because, as *SuperShuttle* recognizes, we owe the Board no deference on matters of law, including the proper formulation of this inquiry. *Id.* at 13; *see FedEx Home Delivery v. NLRB*, 849 F.3d 1123, 1128 (D.C. Cir. 2017).

and remain an official, and controls their conduct and the uniforms they must wear. *See id.* at 567. PIAA also sets the rules officials are charged with enforcing using a template from the National Federation of State High School Associations that PIAA updates as it sees fit. *See Collegiate Basketball Officials Ass'n v. NLRB* (*Big East*), 836 F.2d 143, 148 (3d Cir. 1987) (choosing to adopt another body's rules indicates control). But telling an official to call a game fairly is hardly akin to instructing a worker how to work, as the symphony conductor does when he tells the bassoonist to play a particular note soft or loud. *See Lancaster Symphony Orchestra*, 822 F.3d at 566; *Pa. Acad. of the Fine Arts*, 343 N.L.R.B. at 847 (that individual "retain[s] significant discretion" over how to execute employer's general guidance favors independent-contractor status). We recognize that this is somewhat inherent in the nature of officiating. But PIAA could exercise more control in the moment by, for example, assigning Association representatives to review calls made on the field or providing feedback to officials at the earliest possible moment. It does neither. *See Big East*, 836 F.2d at 148 (finding "significant supervisory control" where officials received feedback "at the earliest convenient moment, half-time or postgame"). Moreover, although PIAA reserves the right to suspend or disqualify officials who violate these various rules, there is no evidence that it has ever done so. That lessens some of the other indicia of control. *See Lancaster Symphony Orchestra*, 822 F.3d at 566 (that organization has and enforces detailed rules of conduct indicates significant control); *United Ins.*, 390 U.S. at 258 (same). Apart from evidence about PIAA itself, the record does not reveal whether similar refereeing in the area PIAA serves is usually done by supervised employees or independently. Factors 1 and 3 are thus a mixed bag, but on balance, they slightly favor employee status.

12

C

This case turns on the strength of the few times on which PIAA actually pays the officials and the short duration of the officials' employment. When these factors are given proper consideration, the weight of the evidence demonstrates that these amateur lacrosse officials are independent contractors. Indeed, "almost every state court decision involving an amateur sports official's employment status" has come to the same conclusion. Marc Sushner, *Are Amateur Sports Officials Employees?*, 12 SPORTS LAW. J. 123, 125 (2005); *accord* WALTER T. CHAMPION, JR., FUNDAMENTALS OF SPORTS LAW § 10:4 (2018) (collecting worker's compensation cases); *see also Big East*, 836 F.2d 143 (holding that certain college basketball officials are independent contractors). Accordingly, we reverse the Board and hold that the officials are not subject to the protections of the NLRA. *See* 29 U.S.C. §§ 152(3), 157. We therefore need not decide whether PIAA is an employer or a political subdivision of Pennsylvania.

III

We grant the petition for review, vacate the Board's order, and deny the cross-application for enforcement.

*So ordered.*